En el Tribunal Supremo de Puerto Rico

| El Pueblo de Puerto Rico Peticionario  V.  Kathia Bonilla Bonilla Recurrida | Certiorari  99 TSPR 151 |
|---|---|

Número del Caso: CC-1998-0609

Abogados de la Parte Peticionaria: Hon. Procurador General
                                   Lcda. marta Maldonado Maldonado
                                   Procuradora General Auxiliar

Abogado de la Parte Recurrida:     Lcdo. Edgardo L. Llorens

Tribunal de Primera Instancia, Sala Superior de Ponce

Juez del Tribunal de Primera Instancia: Hon. Francisco ortiz Rivera

Tribunal de Circuito de Apelaciones: Circuito Regional V Ponce

Juez Ponente: Hon. Negrón Soto

Fecha: 10/7/1999

Materia: Sustancias Controladas

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Peticionario


      v.                           CC-1998-609


Kathia Bonilla Bonilla

    Recurrida



Opinión del tribunal emitida por la Juez Asociada señora NAVEIRA DE RODÓN



San Juan, Puerto Rico, a 7 de octubre de 1999


*La dignidad del ser humano es inviolable.* Constitución del Estado Libre Asociado, Art. II, Sec. 1.


El asunto ante nuestra consideración es uno novel. Nos corresponde determinar cuáles son los requisitos que deben estar presentes para que un funcionario público pueda realizar válidamente un registro al desnudo.

En particular, debemos dilucidar si a la luz de la protección constitucional contra registros y

allanamientos irrazonables, procede la supresión de cierta evidencia entregada por una visitante civil a una institución penal, tras requerírsele un registro al desnudo como condición de admisión.

**I**

El 11 de marzo de 1997, el Ministerio Público presentó una denuncia contra la Sra. Kathia Bonilla Bonilla (en adelante la acusada). Se le imputó haber infringido el Art. 234 del Código Penal, 33 L.P.R.A. sec. 4430. Se le acusó de poseer marihuana con intención de introducirla al Proyecto Modelo de Rehabilitación ubicado en el Municipio de Juana Díaz, (en adelante el Proyecto).

El 29 de abril de 1997, se celebró la vista preliminar. El Ministerio Público presentó el testimonio de la oficial de custodia, señora Aida Luz Pica Lynn (en adelante la oficial), quien el día de los hechos se encontraba llenando boletas para los visitantes de los confinados en el Puesto I del Proyecto. En apretada síntesis, ésta declaró que al ver a la acusada y sus acompañantes[1], la notó "ansiosa" por ver a su esposo allí confinado y que, en vista de ello, <u>solicitó a sus superiores autorización para llevar a cabo un registro al desnudo</u>.

---

[1] La acusada iba acompañada de dos amigas y su bebé, quien también fue registrado.

Testificó que en el lugar hay carteles que indican el tipo de vestimenta que tiene que usar una persona para entrar a la institución penal. Éstos anuncian, además, que toda persona que quiera entrar a la institución será registrada **físicamente** y también se registrarán sus pertenencias. La oficial señaló que dicho registro físico rutinario consistía en someter al visitante a un procedimiento de "cacheo" o registro superficial.

La oficial explicó, que la acusada y sus acompañantes pasaron al área llamada "La Carpa" donde se registraron los paquetes que llevaban consigo y luego al área de "Control Fuera", donde se les informó que se les sometería a un registro **físico**. Testificó que "orientó" a la acusada y a sus acompañantes al efecto de que podían negarse al registro, pero que de rehusarse, no entrarían a visitas ese día.

Continuó declarando que procedió, en compañía de su compañera Ivelisse Rivera, a registrar al desnudo a las dos acompañantes de la acusada en el baño de "Control Fuera."[2] Cuando exigió a la acusada que se "quitara toda la ropa" para "verificarla", ésta le indicó que tenía droga en su poder. Entonces, procedió a sacarla de su ropa interior y a entregársela. Acto seguido, la oficial le ordenó nuevamente que se desnudara. Una vez

---

[2] Este es el tercer puesto de registro al entrar en la intitución.

se desnudó, la oficial procedió a registrar toda la ropa y las pertenencias de la acusada. Luego, le ordenó que se colocara de cuclillas (que se "ñangotara") para ver si tenía más droga en sus partes íntimas. No encontró droga en el cuerpo de la acusada y llamó a la Policía.

A preguntas de la defensa, la oficial admitió que le ordenó a la acusada quitarse la ropa y que ésta entregó la droga "para evitar ser desnudada". La oficial expresó que la acusada presenció el registro al desnudo de sus dos acompañantes. Agregó, que es práctica usual en la institución donde trabaja desnudar a todos los integrantes de un grupo aunque sólo se sospeche de uno. Reconoció que al momento del registro la puerta del baño se encontraba abierta. Añadió que no sabía que para registrar al desnudo a una persona se requiere su consentimiento escrito. Finalmente, admitió no haberle dado a la acusada orientación alguna antes de ordenarle que se desnudara.

Posteriormente, la defensa presentó como testigo a la acusada. Ésta afirmó que cuando llegó al lugar donde se entrega la boleta a los visitantes se le informó a ella y a sus acompañantes que serían registradas. Primero pasaron sus dos amigas, cuyo registro al desnudo presenció. Continuó declarando que, cuando la oficial se le acercó, ella se detuvo y le informó que no se iba dejar registrar. La oficial, sin embargo, le dijo que la registraría de todos modos. Ante esto, la acusada procedió a entregarle la marihuana que llevaba consigo. Aún así, la oficial le advirtió que se tenía que quitar la ropa si quería salir de la institución penal.

Continuó testificando la acusada que mientras se desvestía, la puerta del baño estaba abierta y había tres guardias penales mirando hacia adentro. Nadie la orientó sobre su derecho a negarse a ser registrada. Tampoco firmó documento alguno a esos efectos. La primera persona que le informó sobre su derecho a negarse al registro fue el policía que la arrestó. A preguntas del fiscal, indicó que era la

primera vez que intentaba entrar drogas a una institución penal y que en ese momento no se encontraba nerviosa.

La defensa solicitó que se suprimiese la evidencia, ya que ésta no había sido entregada voluntariamente. Alegó que, por el contrario, la entrega había sido producto de un registro al desnudo realizado en contravención a la Constitución del Estado Libre Asociado de Puerto Rico y a los reglamentos internos que regulan este tipo de registros a los visitantes de las instituciones correccionales del país.[3]

El Ministerio Público se opuso y argumentó, en síntesis, que la entrega de la sustancia controlada fue voluntaria y que el registro al desnudo, del cual no se obtuvo evidencia alguna, fue posterior.

El tribunal de instancia declaró sin lugar la solicitud de supresión de evidencia y señaló juicio para el 22 de enero de 1998. Inconforme con esta determinación, el 24 de diciembre de 1997 la acusada acudió ante el Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito), mediante recurso de certiorari.

El 30 de junio de 1998, el Tribunal de Circuito dictó sentencia mediante la cual revocó la resolución recurrida, ordenó la supresión de la evidencia obtenida y devolvió el caso al foro de instancia para la continuación de los procedimientos. Determinó que en el caso de autos a la acusada no se le informó sobre su derecho a negarse a ser registrada. Indicó, que la acusada entregó las "bombitas" de marihuana que tenía adheridas a su ropa interior bajo coacción, para evitar ser registrada al desnudo en presencia de terceras personas. Resolvió además, que el registro se realizó en contravención a la Constitución y al Reglamento de Visitas que establece un procedimiento obligatorio para registros al desnudo para visitantes a las instituciones correccionales.

---

[3] El tribunal de instancia tomó conocimiento judicial del <u>Reglamento de Normas y Procedimientos para Regular las Visitas de los Confinados y Aceptación de Paquetes</u> (en adelante el Reglamento de Visitas) el cual regula el procedimiento a seguir para realizar registros al desnudo de visitantes en instituciones penales.

Inconforme, el Ministerio Público acudió ante nos. Alega que el Tribunal de Circuito se equivocó al concluir que la evidencia ocupada fue resultado de un registro ilegal, y que por tanto, erró al revocar al foro de instancia y ordenar la supresión de evidencia.[4]

Decidimos revisar y expedimos el recurso.

## II

En apoyo a su contención de que incidió el Tribunal de Circuito al concluir que la evidencia ocupada fue el resultado de un registro ilegal, el Ministerio Público aduce que la acusada entregó la evidencia voluntariamente <u>antes de que comenzara el registro al desnudo</u>. Señala que el registro al desnudo fue posterior a la entrega y que, como de ese registro en particular no se obtuvo evidencia alguna, no resulta pertinente examinar su legalidad. No le asiste la razón.

Tanto el Art. II, Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico, 1 L.P.R.A. Sec. 10, como la Cuarta Enmienda de la Constitución de Estados Unidos, protegen a nuestros habitantes contra registros y allanamientos irrazonables de su persona, pertenencias y propiedad realizados por funcionarios del Estado. En reiteradas ocasiones hemos expresado que la protección constitucional contra registros irrazonables tiene como objetivo básico proteger la intimidad y la dignidad del ser humano. Véanse, <u>Pueblo en Interés del Menor N.O.R.</u>, Op. de 12 de septiembre de 1994, 136 D.P.R. ___ (1994), 94 J.T.S. 119; <u>Pueblo</u> v. <u>Ríos Colón</u>, 129 D.P.R. 71 (1991); y <u>Pueblo</u> v. <u>Lebrón</u>, 108 D.P.R. 324 (1979).

A pesar de que la protección contra registros y allanamientos se encuentra redactada en idénticos términos en ambas constituciones, por gozar nuestra Constitución de una "vitalidad independiente", podemos darle a la garantía un contenido distinto y mayor. Esto es, podemos

---

[4] El Ministerio público planteó además que el Tribunal de Circuito abusó de su discreción al intervenir con la adjudicación de credibilidad hecha por el juzgador de instancia. En vista del resultado al que llegamos, resulta innecesario examinar este error.

interpretarla de forma más beneficiosa al acusado. La Constitución de Estados Unidos y su jurisprudencia interpretativa, sólo establecen el contenido mínimo de la prohibición contra registros e incautaciones irrazonables. Véase, Pueblo v. Dolce, 105 D.P.R. 422 (1976).

A diferencia de la Constitución Federal, nuestra Constitución, en su Art. II Sec. 8, protege específicamente la honra, reputación y la vida privada de las personas. El efecto conjunto de esta cláusula y la garantía constitucional contra registros y allanamientos irrazonables ha sido establecer el derecho a la intimidad como uno de los de más alta jerarquía en nuestro ordenamiento. Véanse, Arroyo v. Rattan Specialties, 117 D.P.R. 35, 64 (1986); Colón v. Romero Barceló, 112 D.P.R. 573, 576 (1982); Figueroa v. E.L.A., 107 D.P.R.250 (1978); E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436, 440 (1975).

La protección constitucional contra registros y allanamientos irrazonables se activa sólo cuando los actos arbitrarios e irrazonables del estado ocurren **como parte de un registro o allanamiento**. En ocasiones anteriores hemos resuelto que "ante toda controversia relacionada con esta protección constitucional, lo primero es determinar la existencia o no de un registro" Véase Pueblo en Interés del Menor N.O.R., supra. Por tanto, de entrada, debemos resolver si dentro de las circunstancias particulares del presente caso, la instrucción de desnudarse *per se* constituyó el comienzo de un registro.

En algunas situaciones no existe duda alguna de que en efecto ha ocurrido un registro. Sin embargo, a menudo resulta difícil hacer tal determinación ya que la garantía constitucional protege a la persona como tal y no a lugares específicos o cosas. Para que ocurra un registro no tiene que haber intervención física alguna en un lugar específico. Sobre este particular, el tratadista La Fave ha señalado:

> ...once it is recognized that the Fourth Ammendment protects people –and not simply "áreas"– against unreasonable searches and seizures, it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure. La Fave, Search and Seizure, 3$^d$ edition, St. Paul, Minn, West Publ. Co., Vol. I Sec.2.1(b) pág. 383.

En cuanto al inicio de un registro en _Pueblo en Interés del Menor N.O.R._, supra, señalamos:

> [s]e entiende que ha ocurrido un registro cuando se infringe una expectativa de intimidad que la sociedad está preparada para reconocer como razonable. (Citas omitidas). 'La cuestión principal es, si dentro de las circunstancias específicas del caso, la persona tiene derecho razonable a abrigar la expectativa de que su intimidad se respete.' (Énfasis suplido.) _Pueblo v. Lebrón_, supra, pág. 331.

En _Pueblo v. Ríos Colón_, supra, enumeramos los factores que deben considerarse al determinar si la persona que alega ha sido registrada albergaba alguna expectativa razonable de intimidad, a saber: 1) el lugar registrado o allanado; 2) la naturaleza y grado de intrusión de la intervención policiaca; 3) el objetivo o propósito de la intervención; 4) si la conducta de la persona era indicativa de una expectativa subjetiva de intimidad; 5) existencia de barreras físicas que restrinjan la entrada o visibilidad al lugar registrado; 6) la cantidad de personas que tienen acceso al lugar registrado; y 7) las inhibiciones sociales relacionadas con el lugar registrado. Estos factores deben examinarse en conjunto, ya que ninguno de ellos por sí solo resulta determinante. Apliquemos estos factores a las circunstancias del presente caso.

No cabe duda de que las personas albergan con respecto a su propio cuerpo la más alta expectativa de intimidad y que una orden de desnudarse entraña una intromisión profunda con dicha expectativa. Ello independientemente del hecho de encontrarse de visita en una prisión. No podemos olvidar que no se trata aquí de la expectativa de intimidad extremadamente reducida que tienen los confinados, sino de la intimidad de una persona civil que visita voluntariamente una institución penal.

La conducta de la acusada al entregar la marihuana "para evitar ser desnudada" indica claramente su intención de proteger lo que ella subjetivamente percibía era su intimidad. La ropa que cubría su

cuerpo, restringía la visibilidad al lugar que la oficial pretendía registrar. Sólo la acusada tenía un derecho legítimo de acceso a su propio cuerpo. Además, existen en nuestra sociedad inhibiciones relativamente altas en relación con el acto de despojarse de toda vestimenta y someter nuestros cuerpos al escrutinio visual de un extraño.

Ciertamente el requerir al visitante a instituciones penales que se someta a un registro al desnudo persigue el objetivo legítimo de evitar la introducción de drogas y armas a éstas. No obstante, la consecución de este objetivo, por sí solo, no puede destruir la expectativa de intimidad de una persona con respecto a su cuerpo. Debemos tener presente que:

> El aumento en el crimen y/o en el trasiego de drogas, así como la política pública en contra de dichos males no son, por sí solas, justificaciones suficientes para flexibilizar estas garantías constitucionales bajo cuyo manto quedamos cobijados todos los puertorriqueños. La democracia no se sostiene con la adopción de métodos antidemocráticos. La solución a tales males no es, pues, la derogación de facto de dichas garantías constitucionales, puesto que existen medios razonables, legales y constitucionales para lidiar con los mismos. Véase Pueblo v. Ríos Colón, supra, pág 81, citando Pueblo v. Lebrón, supra, 327-328 (1979) y a Pueblo v. Martínez Torres, 120 D.P.R. 496 (1988).

Al analizar los hechos en este caso a la luz de la totalidad de los factores enumerados, resulta forzoso concluir que, dentro de este contexto, la indicación imperativa de la oficial de custodia a la acusada a los efectos de que se quitara "toda la ropa" para "verificarla" constituyó intromisión suficiente en la expectativa razonable de intimidad de la acusada para activar la protección constitucional contra registros y allanamientos.

Debemos recordar que esta orden se produce luego de que la oficial de custodia solicitara y obtuviera el permiso de sus superiores para realizar el registro al desnudo y después que la acusada pasara por un proceso de registro que se profundizó a medida que progresaba su entrada a la institución penal. Primero, la acusada atravesó un detector de metales en la entrada. Luego, pasó a "La Carpa" donde

registraron sus pertenencias. Entonces, la llevaron a "Control Fuera" donde presenció los registros al desnudo de sus compañeras. Finalmente, le ordenaron desvestirse, lo cual provoca que entregue la droga para intentar evitar tan grave intromisión con su cuerpo. Dicha orden per se inició el registro para efectos constitucionales.

De hecho, desde que la oficial sospechó de la acusada y pidió autorización a sus superiores para realizar el registro al desnudo, se puso en marcha la maquinaria del Estado. Del testimonio mismo de la oficial se desprende, que la acusada en momento alguno fue informada **del carácter especial y de las implicaciones que reviste este tipo de registro**. Rechazamos la teoría del Ministerio Público de que el registro al desnudo se inició al momento en que la acusada comenzó físicamente a quitarse la ropa y que, por ende, la entrega de la droga no fue producto de un registro. Esta noción es contraria a los hechos, la doctrina y la jurisprudencia que define el registro de forma flexible como la <u>infracción a una expectativa razonable de intimidad</u>.

Resolvemos pues, que en el caso de autos se había iniciado el registro al desnudo <u>antes</u> de que la acusada entregara la marihuana. La acusada albergaba una expectativa razonable de intimidad sobre su cuerpo que fue infringida cuando la oficial le ordenó desvestirse.

III

Nuestra Constitución lo que exige es que los registros y allanamientos no sean irrazonables. Es por ello que, una vez decidido en el caso de autos que en efecto la evidencia se entregó como resultado de un registro, procede que examinemos la razonabilidad de la intervención. Hoy por primera vez, debemos determinar cuáles son los criterios a considerar para que un funcionario público pueda realizar un registro al desnudo a un visitante civil a una institución penal sin infringir las protecciones constitucionales contra registros y allanamientos irrazonables.

Como regla general, se presumen inválidos todos los registros efectuados sin previa orden judicial.  En estos casos, corresponde al Ministerio Fiscal derrotar dicha presunción presentando prueba de la legalidad y razonabilidad del registro.  Pueblo v. Vázquez Méndez, 117 D.P.R. 170, 174 (1986); Pueblo v. Narváez Cruz, 121 D.P.R. 429 (1988); Pueblo v. Reynolds Román, Op. de 17 de enero de 1995, 137 D.P.R. ___ (1995), 95 J.T.S. 6;  Pueblo v. Santiago Alicea, Op. de 18 de abril de 1995, 137 D.P.R. ___ (1995), 95 J.T.S. 45.

A manera de excepción, hemos tendido a sostener la legalidad de cierto tipo de registros, aún en ausencia de una orden judicial.  La jurisprudencia la ha reconocido, entre otras situaciones: cuando la evidencia se encuentra a plena vista, Pueblo v. Dolce, supra; cuando la evidencia es obtenida en el transcurso de una persecución, Pueblo v. Riscard, 95 D.P.R. 405 (1967); cuando la evidencia es obtenida en un registro administrativo en una actividad altamente reglamentada por el Estado, E.L.A. v. Coca-Cola, 115 D.P.R. 197 (1984); cuando ha mediado consentimiento para el registro, Pueblo v. Narváez Cruz, supra.; en algunos registros incidentales al arresto, Pueblo v. Sosa Díaz, 90 D.P.R. 622 (1964); y en el registro de emergencia, Pueblo v. Rivera Collazo, 122 D.P.R. 408 (1988).  Véase además, Ernesto L. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, vol. I, sec. 6.13, pág. 272 (1995).

Al decidir si procede eximir a las autoridades de la necesidad de obtener una orden judicial de registro, la pregunta no debe ser sólo si el interés público lo justifica, sino si el peso de conseguir dicha orden bajo las circunstancias particulares del caso, probablemente frustraría el propósito gubernamental legítimo que se persigue.

Aún en aquellos casos excepcionales en que inicialmente resulta legal intervenir con el ciudadano sin orden judicial, la posterior determinación de razonabilidad del registro debe hacerse tomando en cuenta todas las circunstancias, particularmente las exigencias de urgencia, y haciendo un balance entre los derechos del individuo y las

necesidades de la sociedad.   Pueblo v. Torres Lozada, 106 D.P.R. 588 (1977).   Véanse, además: United States v. Biswell, 406 U.S. 311 (1972); Terry v. Ohio, 392 U.S. 1 (1968); Elkins v. United States, 364 U.S. 206 (1960).   Recientemente reiteramos que "[l]a razonabilidad de un registro dependerá del balance entre el interés público y el derecho del ciudadano a su seguridad personal, libre de interferencias arbitrarias por parte del Estado." Pueblo en interés del Menor N.O.R., supra.

En el caso particular de las instituciones correccionales, es innegable que el Estado tiene un interés apremiante en mantener el orden y la seguridad en las mismas.   Evitar que las personas con acceso a las instituciones correccionales introduzcan drogas, contrabando y armas resulta indispensable para mantener tanto la seguridad como el orden.   En atención a ello se reduce el grado de expectativa a la intimidad y la protección a la misma, tanto de los confinados, como de personas civiles que desean entrar a visitar en instituciones penales, aunque en distintos grados.   Véase, Spear v. Sowders, 71 F.3d 626, 629 (1995).

Al amparo de la Cuarta Enmienda de la Constitución de Estados Unidos se ha considerado razonable someter rutinariamente a las personas que deseen entrar como visitantes a dichas instituciones a cierto tipo de registro sin necesidad de orden ni sospecha alguna. Sobre el asunto, el reconocido tratadista La Fave señala,

> Security is the order of the day in prisons, jails and other detention facilities.  The prisoners are subject to searches of their persons and quarters, and in addition it is often the practice to require visitors to the facility to submit to some form of search.  Applying the *Camara-Terry* balancing approach to the latter practice, it may be said that the need for security is sufficiently substantial as to justify some type of screening process for visitors. (Énfasis suplido.) [5]

En aras de proteger la seguridad de los empleados y confinados, resulta razonable someter a los visitantes de instituciones penales a registros superficiales sin necesidad de obtener una orden judicial, ni

de tener motivos fundados.  Entre los registros superficiales más comunes se encuentran los registros físicos o de "cacheo", los efectuados por medios electrónicos de detección de armas y drogas y los que utilizan perros.  Otras formas de proteger la seguridad en las cárceles incluyen las visitas sin contacto, el registrar al desnudo <u>a los confinados</u> tras las visitas y proveer visitas supervisadas.

Las intervenciones superficiales antes mencionadas pueden considerarse como registros de índole administrativo ya que se realizan rutinariamente, como parte del procedimiento regular de entrada a la institución.  En atención a las necesidades especiales de las instituciones penales, estos registros pueden realizarse sin necesidad de orden judicial o sospecha alguna.  Ahora bien, cuando un oficial de custodia decide realizar un registro más profundo del usual, como lo es un registro al desnudo, cambia la naturaleza de la intervención.  Ya no se trata de una intervención rutinaria de índole administrativa, sino más bien de un registro de naturaleza penal.  El registro al desnudo se realiza con base a una sospecha particularizada y con la expectativa de obtener material delictivo que incriminaría a la persona registrada.

El registro al desnudo, conocido en Estados Unidos como "strip search", implica una de las más graves interferencias con la expectativa de intimidad de las personas, aunque se trate de la expectativa de intimidad algo disminuida que albergan los civiles que deciden visitar una institución correccional.  Sobre este particular, en <u>Blackburn</u> v. <u>Snow</u>, 771 F.2d 556, 563 (1985 1st Cir.) el tribunal señaló:

> We think it is clear that society is prepared to recognize that free citizens entering a prison as visitors retain a legitimate expectation of privacy protected by the Fourth Amendment, albeit diminished by the exigencies of prison security.  To be sure, those visiting a prison cannot credibly claim to carry with them the full panoply of rights they normally enjoy.  But neither may they constitutionally be made to suffer a wholesale loss of rights —<u>nor even one commesurate with that suffered by inmates</u>.  (Énfasis suplido.)

---

[5] La Fave, Search and Seizure, supra, sec. 10.7(b), pág. 383.

El registro al desnudo ha sido descrito como una experiencia humillante, embarazosa y que atenta contra la dignidad de las personas. Tomando en consideración esta realidad, los tribunales federales reiteradamente han requerido la existencia de una sospecha, razonable o real, individualizada y basada en hechos objetivos articulables, para iniciar validamente un registro de este tipo. En Black v. Amico, 387 F. Supp. 88, 91 (1974), la Corte de Distrito de los Estados Unidos para el distrito de Nueva York citando a United States v. Henderson, 390 F. 2d 805 (9th Cir. 1967), definió sospecha real de la siguiente manera:

> "Real suspicion" justifying the initiation of a strip search is subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs oficial to suspect that a particular person seeking to cross our border is concealing something in his body for the purpose of transporting it into the United States contrary to law.

Este mismo caso establece que el registro fronterizo y el de los visitantes a prisiones son análogos en el sentido de que en ambos casos se intenta prevenir la entrada de contrabando y otro material ilegal. Véase, además, United States v. Hernández, 473 U.S. 531 (1985) donde el Tribunal Supremo Federal resolvió que para poder llevar a cabo un registro fronterizo al desnudo se necesitaba al menos una "sospecha real".

En Puerto Rico, en vista de la protección más amplia que provee nuestra Constitución al derecho a la intimidad, este Tribunal, con contadas excepciones, ha requerido la existencia de motivos fundados al validar el inicio de registros sin orden. El concepto de "motivos fundados" ha sido definido como aquella información o conocimiento que lleva a una persona ordinaria y prudente a creer que la persona intervenida ha cometido un delito, independientemente de que luego se establezca o no la comisión del delito. Véase Pueblo v. Martínez Torres, 120 D.P.R. 496 (1988).

En Pueblo v. Ríos Colón, supra, señalamos que para determinar si un registro sin orden judicial es razonable debemos considerar si:

a) En su origen la intervención con la persona en el lugar que sería registrado estuvo justificada. Aquí debemos examinar la expectativa razonable de intimidad del intervenido en el lugar donde se encontraba y si la funcionaria del Estado tenía motivos fundados para intervenir, y si su presencia en el lugar donde se encontraba la persona que sería registrada estaba justificada.

b) Una vez superada esa justificación inicial, debemos examinar si el alcance o la amplitud del registro (como se condujo) estaba razonablemente relacionada con las circunstancias que justificaron la intervención en primer lugar. Tal registro no puede ser excesivamente intrusivo en la persona que es registrada. Aunque muchas veces sea difícil entenderlo, el resultado del registro no prueba su razonabilidad ni convalida una intervención ilegal o irrazonable de los funcionarios del Estado con los ciudadanos, Pueblo v. Martínez Torres, supra; Pueblo v. González, 100 D.P.R. 651 (1972), pues "[e]n nuestro país, la Constitución y las leyes no solamente protegen al ciudadano modelo, sino también al infractor...[y] todo acusado tiene derecho a la presunción de inocencia... aunque se le sorprenda in fraganti". Soto v Srio. de Justicia, 112 D.P.R. 477, 503-504 (1982). (Énfasis suplido.)

Cónsono con estos principios constitucionales, el Reglamento de Normas y Procedimientos para Regular las Visitas de los Confinados y Aceptación de Paquetes[6], (en adelante Reglamento de Visitas), que rige esta materia, exige específicamente que hayan motivos fundados basados en hechos objetivos para que se pueda **iniciar** un registro al desnudo. En la parte pertinente dicho reglamento dispone:

K. Registros al desnudo

Para someter a un visitante a este tipo de registro, tiene que existir la sospecha razonable basada en hechos específicos e inferencias razonables de que el visitante intenta introducir contrabando. No será suficiente meras sospechas o confidencias no corroboradas. Tampoco basta que el visitante tenga apariencia extraña o sospechosa. La sospecha razonable, requiere que existan hechos objetivos específicos que a la luz de la experiencia permitan inferencias que lleven a una persona razonable a sospechar que se ha cometido un delito o está por cometerse.

Bajo esta norma, el registro al desnudo de un visitante requiere, (1) que los oficiales han de tener una sospecha de que la persona a registrarse intenta introducir contrabando; esta sospecha tiene que estar específicamente dirigida contra esa persona en particular y (2) tienen que existir motivos fundados para creer que el contrabando se encuentra en el lugar específico que va a registrarse. (Énfasis suplido.)

---

[6] Este reglamento fue adoptado al amparo de la Ley Núm. 116 de 22 de julio de 1974, según enmendada ,4 L.P.R.A. sec. 1111 y ss. y a la luz de las disposiciones de la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. sec. 2102 y ss.

Reconocemos que exigir a los oficiales de custodia el peso de conseguir una orden judicial en estos casos, frustraría el propósito del registro. Sin embargo, tampoco podemos validar una intervención de tal magnitud en ausencia de unos claros motivos fundados y de un consentimiento voluntario e informado por parte de la persona a ser registrada. El balance de los intereses del Estado y el derecho a la intimidad del ciudadano en estos casos no puede arrojar otro resultado.

Conforme con lo antes expuesto, resolvemos que en Puerto Rico no puede iniciarse válidamente un registro al desnudo a un visitante a una prisión en ausencia de motivos fundados para creer que lleva material ilegal sobre su cuerpo. La <u>sospecha constitutiva de motivos fundados debe ser individualizada y debe estar basada en hechos objetivos articulables</u>. La mera sospecha de un oficial de custodia no será suficiente para justificar este tipo de intervención. Así lo exigen tanto los preceptos constitucionales como el Reglamento de Visitas aplicable las instituciones correccionales.

En el caso de autos la acusada Bonilla Bonilla albergaba una expectativa razonable de intimidad con relación a su cuerpo y su ropa, no empece a que se encontrara visitando una institución correccional. El único fundamento que la oficial de custodia pudo articular durante su testimonio como base para iniciar el proceso de registro al desnudo contra la acusada fue que ésta se encontraba "ansiosa, desesperada por entrar" a ver a su esposo que se encontraba allí confinado. Ahora bien, en ausencia de circunstancias sospechosas adicionales, <u>el nerviosismo, por sí solo, no justifica un registro al desnudo</u>. Al respecto, el Reglamento de Visitas específicamente señala que la apariencia extraña o sospechosa de una persona no basta para iniciar un registro al desnudo.

De la propia prueba presentada por el Ministerio Público, específicamente, del testimonio de la oficial de custodia, se desprende que la sospecha no cumplía con los requisitos antes expuestos. Ella se

dispuso a registrar a la acusada sólo por que la notó nerviosa. Además, como era la costumbre en dicha institución, también procedió a hacerle un registro al desnudo a las acompañantes de la acusada por el único hecho de estar éstas con una persona que se encontraba nerviosa.[7]

La totalidad de las circunstancias denotan que al decidir registrar al desnudo a la acusada y a sus acompañantes, la oficial de custodia no cumplió con el requisito inicial de tener una sospecha razonable basada en hechos objetivos articulables constitutivos de motivos fundados. Desde su origen, la intervención de la oficial de custodia con la acusada estuvo viciada y en contravención tanto al Reglamento de Visitas, como con la protección constitucional contra registros irrazonables.[8]

Al ser la orden de desnudarse parte del registro al desnudo y la entrega de la evidencia resultado directo de dicha orden, no cabe duda de que la evidencia se obtuvo como resultado de una intervención ilegal del Estado con la acusada. Sobre todo cuando ni los carteles en la entrada de la institución penal, ni la orientación dada por la oficial apercibían a la acusada del alcance de lo que iba a suceder y de su derecho a negarse al registro al desnudo y marcharse en <u>cualquier etapa del mismo</u>. Tampoco se le advirtió del hecho de que para realizar un registro al desnudo, las autoridades tenían que obtener su consentimiento por escrito y seguir un estricto procedimiento.[9]

_____

[7] La oficial de custodia declaró a los efectos de que <u>lo usual</u> en la institución penal donde laboraba era que cuando se "sospechaba" de una persona, se desnudaba a todos sus acompañantes.

[8] Vale señalar que, aún cuando se cumpliera con el requisito inicial de motivos fundados, el procedimiento de registro de visitantes a las instituciones correccionales es uno que está detalladamente regulado. Un registro tan denigrante debe llevarse a cabo con estricta sujeción y adhesión a las normas reglamentarias de la propia institución. Sólo de este modo que se garantiza la voluntariedad y se minimiza al máximo la lesión a la intimidad y dignidad del registrado. Debemos recordar que en el caso de autos la propia oficial admite haber llevado a cabo los registros al desnudo con la puerta del baño abierta, y que por lo menos la acusada, pudo ver a sus compañeras desvestirse.

[9] Nos preocupa el desconocimiento craso de la oficial de custodia de las disposiciones básicas del Reglamento de Visitas en cuanto éste regula los registros al desnudo. Una vez un oficial tiene una sospecha

individualizada constitutiva de motivos fundados, el Reglamento de Visitas establece el siguiente procedimiento para realizar estos registros:

...Para realizar registros al desnudo a un visitante, se seguirá el siguiente procedimiento:

1.   Será informado que por existir sospecha razonable sobre su persona, será sometido a un registro especial. Dicho registro se llevará a cabo al desnudo.

2.   Será orientado por el oficial de más alto rango en el área de visitas y se le solicitará que firme el formulario correspondiente autorizando este tipo de registro. De negar su autorización, no se permitirá su acceso al penal ese día.

3.   Luego de que se haya obtenido la autorización correspondiente, el visitante será conducido a la habitación destinada a ese propósito, asegurándose de que el área no quede expuesta al público, de modo que no se lesione su dignidad.

4.   El registro será realizado por un oficial del mismo sexo que el visitante. Bajo ninguna circunstancia se permitirá un registro al desnudo a un visitante por un oficial del sexo opuesto. Se evitará en todo momento, el contacto físico directo con el visitante. Toda violación a esta norma conllevará la imposición de las sanciones que procedan contra el empleado.

5.   Se requerirá al visitante que se despoje por completo de sus vestimentas, incluyendo los zapatos y se pedirá que se coloque en cuclillas por unos segundos. Se inspeccionará cuidadosamente la ropa del visitante, luego de lo cual se le devolverá. Se inspeccionará el área sobre la cual se colocó al visitante para localizar contrabando arrojado al suelo o que se desprenda de su cuerpo.

6.   Si durante el procedimiento de registro el visitante opone resistencia, se suspenderá el mismo y se solicitará que abandone la institución. En caso de mediar agresiones físicas o verbales hacia los oficiales, se referirá a Comandancia para la correspondiente acción penal.

7.   Si se detecta la presencia de drogas, explosivos o armas de cualquier tipo, instrumentos o herramientas que puedan utilizarse para cometer una fuga, o causar grave daño corporal o muerte, se conducirá al visitante y la evidencia a la Comandancia o deberá llamarse inmediatamente a la Policía para la acción correspondiente. Tanto el Comandante de turno, como los oficiales participantes, rendirán un informe detallado y servirán de testigos durante el proceso criminal hasta finalizar el mismo. En estos casos, se prohibirá permanentemente la entrada a del visitante a toda intitución penal.

8.   En todo momento se tratará al visitante de forma digna y respetuosa, evitando comentarios o situaciones que lesionen su dignidad o constituyan una interferencia indebida con su derecho a la intimidad. El incumplimiento de estas normas conllevará la imposición de sanciones administrativas, civiles o criminales que procedan contra esos empleados.

9.   Los oficiales asignados a las áreas de visita serán adiestrados sobre estos procedimientos y las consecuencias de violentar los mismos. Serán adiestrados oficiales de ambos sexos para asegurar el fiel cumplimiento de estas normas. (Énfasis suplido.)

Como podrá notarse, en el caso de autos  la mayoría de las disposiciones de este Reglamento de Visitas no fueron cumplidas.

El registro al desnudo de la acusada en el caso de autos estuvo viciado *ab initio*.  En consecuencia, procede suprimir la evidencia entregada como respuesta a la orden de desnudarse.

Por los fundamentos antes expresados, confirmamos al Tribunal de Circuito de Apelaciones y devolvemos el caso al Tribunal de Primera Instancia, Sala Superior de Ponce para ulteriores procedimientos compatibles con lo aquí resuelto.


                                    MIRIAM NAVEIRA DE RODÓN
                                        Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Peticionario


      v.                           CC-1998-609


Kathia Bonilla Bonilla

    Recurrida


SENTENCIA


San Juan, Puerto Rico, a 7 de octubre de 1999


      Por los fundamentos antes expresados, se dicta sentencia confirmando la del Tribunal de Circuito de Apelaciones.  Se devuelve el caso al Tribunal de Primera Instancia, Sala Superior de Ponce para ulteriores procedimientos compatibles con lo aquí resuelto.

      Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo.  El Juez Asociado señor Fuster Berlingeri concurre con opinión escrita a la cual se unió el Juez Asociado señor Corrada del Río.  El Juez Asociado señor Rebollo López concurrió sin opinión escrita.


                    Isabel Llompart Zeno
              Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Peticionario


      vs.                              CC-1998-609         Certiorari


Kathia Bonilla Bonilla

    Recurrida


Opinión Concurrente emitida por el Juez Asociado señor FUSTER BERLINGERI, a la cual se une el Juez Asociado señor CORRADA DEL RIO.

San Juan, Puerto Rico, a 7 de octubre de 1999.


> "...[H]ard cases make bad law".
> Justice Oliver Wendell Holmes

Hace ya casi un siglo, el gran jurista Oliver Wendell Holmes, uno de los jueces de más renombre del Tribunal Supremo de los Estados Unidos, advirtió que los casos difíciles dan lugar a decisiones judiciales desacertadas. Indicó el Juez Holmes que ello ocurre porque el intenso deseo de proteger uno de los intereses contrapuestos en el caso, lleva a distorsionar las normas aplicables. Lo explicó así el Juez Holmes, al afirmar que "...hard cases make bad law"

> "...because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgement. These immediate interests exercise a kind of hydraulic pressure which makes what

previously was clear seem doubtful, and before which even well settled principles of law will bend." [10]

La opinión de la mayoría en el caso de autos es un ejemplo claro de lo advertido por el Juez Holmes. El abrumador interés de la mayoría por proteger el supuesto derecho a la intimidad de una persona acusada de intentar introducir marihuana subrepticiamente a una institución penal, lleva a la mayoría a ignorar normas fundamentales vigentes que son aplicables a este caso. Veamos.

I

El caso de autos presenta la cuestión de si deben suprimirse, como evidencia obtenida de modo ilícito, unas "bombitas" de marihuana que una mujer entregó a una oficial de custodia en una institución penal, cuando la oficial supuestamente le indicó que sería registrada al desnudo. La mujer en cuestión iba a visitar a su marido que se encontraba recluido en la institución penal, y llevaba la droga escondida, con la obvia intención de entrar dicha droga subrepticiamente en la institución penal.

La mayoría del Tribunal ordena la supresión de la evidencia, por entender que la entrega de la droga por la propia acusada a la oficial de custodia fue parte de un registro ilícito que violaba el derecho a la intimidad de la acusada. Para lograr este resultado, la mayoría llega                                                             al

---

[10]Opinión disidente del Juez Oliver Wendell Holmes en Northern Securities v. United States, 193 U.S. 197 a la pág. 400-401.

extremo de resolver que aunque la acusada misma entregó la droga **antes** de ser registrada al desnudo precisamente con la intención de evitar ser desnudada, el registro referido posterior a la entrega hace que toda la intervención de la oficial de custodia con la acusada esté viciada *ab initio*.  Según la mayoría, la supuesta expectativa de la acusada sobre la intimidad de su cuerpo es tan amplia que abarca la conducta de la oficial de custodia aun antes de ésta realizar el registro al desnudo y le resta voluntariedad a la decisión de la propia acusada de entregar la droga.

La postura aludida de la mayoría presenta en mi parecer varios problemas que ésta no logra resolver satisfactoriamente. El principal de ellos es que le reconoce un derecho a la intimidad a la acusada en este caso, a pesar de que dicha mayoría también admite en su opinión que "requerir al visitante a instituciones penales que se someta a un registro al desnudo persigue el objetivo legítimo de evitar la introducción de drogas y armas a éstas". Para mí la mayoría no logra armonizar debidamente los intereses supuestamente contrapuestos en la situación de hechos del caso de autos.

Comparto con la mayoría el juicio de que el registro al desnudo es una experiencia humillante y embarazosa, que atenta claramente contra la dignidad de las personas.  De ordinario, tal registro constituye una crasa violación al fundamental derecho a la intimidad de toda persona, que este Tribunal no debe tolerar.

Sin embargo, nos enfrentamos en el caso de autos a una situación muy excepcional.  No tenemos ante nos el caso típico en el que es el Estado el que inicia un registro y pretende inmiscuirse con la privacidad o la intimidad de algún ser humano.  La situación ante nos más bien es la de una persona adulta y racional, que voluntariamente y por su propia cuenta e iniciativa se presenta de visita a un lugar altamente sensitivo, en el cual el Estado tiene intereses apremiantes de seguridad que debe proteger con gran rigor, y allí, poseyendo droga ilícitamente, intenta introducirla de modo ilícito también en dicho

lugar. La pretendida intrusión flagrantemente ilícita aquí, pues, es la de la acusada. La mayoría en su opinión no pondera debidamente este dato innegable, al sopesarlo frente al supuesto derecho a la intimidad de la acusada.

Más aun, reiteradamente hemos resuelto que el derecho a la intimidad tiene su límite en la conducta criminal. Repetidamente hemos señalado que los que redactaron nuestra Constitución indicaron de modo expreso y claro que las garantías constitucionales como el derecho a la intimidad, que tienen el propósito de salvaguardar la inviolabilidad de la persona, "tienen su límite en la conducta criminal". 4 Diario de Sesiones de la Convención Constituyente, a las págs. 2567-2568 (Ed. 1961); Pueblo v. Santiago Feliciano, Opinión de 9 de noviembre de 1995, 139 D.P.R. ___, 95 JTS 154; Pueblo v. Martínez Torres, 120 D.P.R. 496 (1988); Pueblo v. Pérez Pérez, 115 D.P.R. 827 (1984). La acusada en el caso de autos incurrió en una actividad **doblemente delictiva**. No sólo poseía una droga ilícita, sino que pretendía introducirla ilícitamente a una institución penal. Dentro de tales circunstancias, **no tenía derecho a abrigar razonablemente una expectativa de intimidad**. Pueblo v. Ortiz Rodríguez, Opinión de 29 de enero de 1999, 147 D.P.R. ___, 99 JTS 8, a la pág. 514. La mayoría ignora todo lo anterior, en su afán desproporcionado de reconocer un derecho a la intimidad a una persona que por su propia conducta abdicó a ese derecho. La postura de la mayoría tuerce injustificadamente el entramado normativo sobre el derecho a la intimidad, por lo que no puedo estar de acuerdo con los fundamentos de su dictamen.


                                    II

La desacertada postura de la mayoría sobre el derecho a la intimidad en el caso de autos es, además, **innecesaria**. El asunto ante nos puede resolverse de un modo sencillo, mucho menos controversial que el que ha utilizado la mayoría. No es necesario fraguar un supuesto asunto constitucional novel para dirimir la controversia ante nos.

Este Foro no debe desatender la sabia norma de autolimitación que preceptúa no abordar cuestiones constitucionales cuando existen otros fundamentos para resolver el caso. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958).

Aquí la oficial de custodia que registró a la acusada no observó las disposiciones pertinentes del Reglamento de Normas y Procedimientos para Regular las Visitas a Confinados. No se siguió el procedimiento pautado en dicho Reglamento para efectuar registros como el que tenemos ante nuestra consideración ahora. Ese incumplimiento de la oficial de custodia con las normas de la propia institución penal que regulan las situaciones de visitas a confinados es suficiente para ordenar la supresión de la evidencia que nos concierne en el caso de autos.

Repetidamente hemos resuelto que las agencias y organismos gubernamentales están compelidos a observar estrictamente sus propios reglamentos. No queda a su discreción cumplir las obligaciones que tales reglamentos le fijan. T-Jac, Inc. (Wal-Mart Caguas) v. Caguas Centrum Limited Partnership, S.E., Opinión de 12 de abril de 1999, ___ D.P.R. ___, 99 JTS 60; Montoto v. Pelayo Lorié, Opinión de 11 de marzo de 1998, 145 D.P.R. ___, 98 JTS 25; García Caban v. U.P.R., 120 D.P.R. 167 (1987). Sobre todo en situaciones tan sensitivas como las del caso de autos, es imperativo que insistamos en que se cumplan las normas reglamentarias rigurosamente. Para lograr esa meta, debemos ordenar la supresión de evidencia en cuestión, que fue obtenida sin que se hubieran observado cabalmente las normas que rigen la institución penal.

En resumen, pues, concurro con el resultado decretado por la mayoría en el caso de autos, pero por un fundamento muy distinto al formulado por ésta.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO