EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Estado Libre Asociado de Puerto Rico representado por el Departamento de Justicia, Oficina de Asuntos Monopolísticos<br>          Demandante-recurrido<br><br>                    v.<br><br>Saint James Security Services, Inc.; Luis Maldonado Trinidad, Como Presidente de Saint James Security Services, Inc.; National Investigation and Protection Group, Inc.; y Héctor M. Rivera Serrano, como Presidente de National Investigation and Protection Group, Inc.<br>          Demandados-peticionarios<br><br>Puerto Rican Cement Company, Inc.<br><br>          Interventora | Certiorari<br><br>2007 TSPR 145<br><br>171 DPR \_\_\_\_ |

Número del Caso: CC-2000-995

Fecha: 31 de julio de 2007

Tribunal de Apelaciones:

                    Región Judicial de San Juan

Juez Ponente:

                    Hon. German J. Brau Ramírez

Abogados de la Parte Peticionaria:

                    Lcdo. Edwin L. Bello Rivera
                    Lcda. Dora M. Peñagarícano

Oficina del Procurador General:

                    Lcda. Carmen A. Riera Cintrón
                    Procuradora General Auxiliar

Materia: Mandamus

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Estado Libre Asociado de Puerto Rico representado por el Departamento de Justicia, Oficina de Asuntos Monopolísticos<br>Demandante-recurrido<br><br>v.<br><br>Saint James Security Services, Inc.; Luis Maldonado Trinidad, como Presidente de Saint James Security Services, Inc.; Nacional Investigation and Protection Group, Inc.; y Héctor M. Rivera Serrano, como Presidente de Nacional Investigation and Protection Group, Inc.<br>Demandados-peticionarios<br><br><br>Puerto Rican Cement Company, Inc.<br>Interventora | *Certiorari*<br><br><br><br>CC-2000-995 |

SENTENCIA

En San Juan, Puerto Rico, a 31 de julio de 2007.

En el presente recurso atendemos la solicitud que nos hacen los recurrentes Saint James Security Services, en adelante Saint James, National Investigation Group, en adelante National, y la interventora Puerto Rican Cement Co., en adelante PRC, para que revoquemos la sentencia dictada por el Tribunal de Apelaciones que

confirmó al Tribunal de Primera Instancia. En sus respectivas sentencias, los foros inferiores validaron un *subpœna duces tecum et ad testificandum* emitido por la Oficina de Asuntos Monopolísticos del Departamento de Justicia, en adelante OAM, y dirigido a los recurrentes como parte de una investigación antimonopolística centrada en PRC.

I

Como resultado de varias querellas presentadas ante la OAM con relación a posibles prácticas monopolísticas en la industria del cemento, dicha oficina comenzó a investigar a la PRC. Estas querellas le imputan a la PRC haber intentado monopolizar la industria del cemento y haber efectuado actos para restringir ilegalmente y de manera horizontal el comercio en la industria del cemento al intentar dividir el mercado geográficamente y mediante carteles, hacer acuerdos de no competencia, fijar precios y llevar a cabo otras conductas anticompetitivas de índole no económica. Las imputaciones que se le hacen a la PRC implican posibles infracciones a los artículos 2 y 4 de la Ley núm. 77 del 25 de junio de 1964, 10 L.P.R.A. secs. 258 y 260.

El 18 de noviembre de 1997 la OAM cursó un *subpœna duces tecum et ad testificandum* a Saint James, empresa que se dedica a brindar servicios de seguridad. Dicho requerimiento fue reiterado el 8 de enero de 1998. El 3 de

febrero de 1998 la OAM emitió un tercer *subpœna*, esta vez más amplio que los primeros.[1]

El 2 de marzo de 1998, la OAM envió a la otra recurrente, National, un *subpœna* similar. Ante la renuencia de los recurrentes, la OAM acudió el 18 de junio de 1998 al Tribunal de Primera Instancia y presentó un recurso de *Mandamus* para que el tribunal les ordenara a

---

[1] La OAM solicitó los siguientes documentos:

1. Contratos existentes en el período comprendido de enero de 1994 al presente entre Saint James Security y la Puerto Rican Cement, Ponce Cement o directores, oficiales o representantes autorizados de éstas.
2. Fecha de duración de los contratos y cláusulas establecidas en éstos.
3. Nombre, dirección y teléfono de las personas que fueron asignadas al cumplimiento de dichos contratos.
4. Fotos, memos, grabaciones, documentos e informes rendidos por sus empleados en el cumplimiento de esos contratos con la Puerto Rican Cement.
5. Indique si Saint James Security tiene o ha tenido, subsidiarias, compañías afiliadas, entidades comerciales o acciones de capital en otras compañías, personas naturales o jurídicas y/o entidades comerciales que operen bajo otro nombre y que provean o hayan brindado servicios de vigilancia, seguridad, detectivescos o policíacos a la Puerto Rican Cement en el período comprendido de enero de 1994 al presente. Además indique cualquier contrato o acuerdo para proveer servicios, similares a los descritos en el presente inciso, con persona jurídica o natural que no sea propiedad, en todo o en parte o afiliada a la Saint James Security.
6. Cualquier documento, incluyendo los mencionados en los incisos 1, 2, 3, 4 y 5 de este subpoena; archivo, comunicación y/o material relacionado a servicios de vigilancia, seguridad, detectivescos o policíacos, brindados a la Puerto Rican Cement, por cualquier persona natural o jurídica, propiedad o afiliada de la Saint James Security, en el período comprendido de enero de 1994 al presente.

cumplir con el *subpœna*. La OAM argumentó que emitió los referidos *subpœnas* por entender que los recurrentes "tienen conocimiento y poseen información, evidencia y documentos como agencias de seguridad y oficiales autorizados de dichas agencias, que son necesarios en la investigación en curso de la [OAM] sobre alegadas violaciones y practicas injustas en la industria del cemento."[2] Estas razones no fueron expresadas en los *subpœnas*. La PRC solicitó intervenir en el pleito, a lo cual el foro de primera instancia accedió.

Luego de escuchar los argumentos de las partes, el Tribunal de Primera Instancia ordenó a la OAM a particularizar y aclarar cuál era la información que solicitaba a los recurrentes. La OAM optó por emitir un segundo *subpœna duces tecum et ad testificandum* el 5 de octubre de 1998, ante el cual los recurrentes insistieron en su negativa a comparecer.

La citación solicitó los siguientes documentos:

1. Contratos vigentes en los pasados (4) años entre Saint James y la Puerto Rican Cement Company (PRCC) o representantes autorizados de ésta.

2. Indique si Saint James tiene o ha tenido, subsidiarias, corporaciones, compañías, negocios, entidades comerciales u otras personas naturales o jurídicas en las que tiene o tuvo interés propietario o de acciones de capital y que operan bajo otro nombre y que provean o hayan brindado servicios de vigilancia, seguridad, detectivescos o policíacos a la PRCC en el período comprendido de enero de 1994 al presente.

---

[2] Tomado de la Demanda y Petición de la OAM ante el Tribunal de Primera Instancia. Estas razones no han sido reproducidas en las subsiguientes comparecencias de la OAM, incluyendo su comparecencia ante esta Curia.

3. Nombre, dirección y teléfono de empleados, detectives, personas y supervisores; [*sic*] que sean o hayan sido empleados de Saint James; [*sic*] y que fueron asignados al cumplimiento de los contratos que se mencionan en el inciso (1) de los documentos requeridos.

4. Mencione cualquier instrucción u orden de manera escrita u oral dada a Saint James, sus empleados, detectives, personas o supervisores; [*sic*] que sean o hayan sido empleados de Saint James; [*sic*] en relación al cumplimiento de los contratos que se mencionan en el inciso (1) de los documentos requeridos.

5. Fotos y/o videos tomados por empleados o detectives; [*sic*] que sean o hayan sido empleados de Saint James; [*sic*] en el cumplimiento de los contratos que se mencionan en el inciso (1) de este Subpoena y de los cuales haya sido sujeto:

    (a) Cualquier competidor de la PRCC en el negocio del cemento, hormigón o materia prima del cemento.

    (b) Cualquier empresa, corporación, negocio o persona natural o jurídica por razón de sus relaciones comerciales con un competidor de la PRCC en el negocio del cemento, hormigón o materia prima del cemento.

6. Memos e informes rendidos por empleados o detectives; [*sic*] que sean o hayan sido empleados de Saint James; [*sic*] en el cumplimiento de los contratos que se mencionan en el inciso (1) de este Subpoena y de los cuales haya sido sujeto:

    (a) Cualquier competidor de la PRCC en el negocio del cemento, hormigón o materia prima del cemento.

    (b) Cualquier empresa, corporación, negocio o persona natural o jurídica por razón de sus relaciones comerciales con un competidor de la PRCC en el negocio del cemento, hormigón o materia prima del cemento.

Los recurrentes alegaron que el *subpœna* atenta contra la protección que establece nuestro régimen constitucional en la Sección 10$^{ma}$ del artículo II del texto de la

Constitución del Estado Libre Asociado de Puerto Rico, por no informar los hechos concretos que dan base a la solicitud de información. Argumentaron que sin dicha información no se puede evaluar la razonabilidad del *subpœna duces tecum*. Además, adujeron los recurrentes que la Ley de detectives privados en Puerto Rico, Ley 108 del 29 de junio del 1965, en su artículo 18, 25 L.P.R.A. sec. 285q, establece una prohibición de divulgar información que les impide cumplir con el *subpœna duces tecum* de la OAM. [3]

Por su parte, la OAM argumentó que no está obligada a informar y divulgar a los demandados los hechos concretos que dan base a su solicitud de información por encontrarse la pesquisa en la etapa investigativa. Señaló que su interés al emitir los *subpœnas* es indagar si se ha violado la ley, y que no es hasta que se impute delito que surge la obligación de informar los hechos constitutivos de la violación, pues en ese momento es que los recurrentes pueden invocar las garantías constitucionales. Además señaló la OAM que la Ley de detectives privados, *supra*,

---

[3] Prohibición de divulgar información

      Ninguna persona que sea o haya sido detective privado, o empleado de un detective privado, o miembro o empleado de una agencia, divulgará privada o públicamente la información que viniere a su conocimiento en el curso de su trabajo sin el consentimiento expreso por escrito de la persona que contrató los servicios de dicha persona o agencia, exceptuando toda información relacionada con la comisión de delitos públicos y los casos en que fuere requerido para ello por ley. 25 L.P.R.A. 285q

establece una excepción a la prohibición de no divulgar que aplica en el caso de autos. Por último expresó que bajo el poder de investigación conferido por la Asamblea Legislativa en la Ley 77 del 25 de junio del 1964, 10 L.P.R.A. sec. 272, particularmente en su artículo 15, el *subpœna duces tecum* no adolece de vicio constitucional.

El Tribunal de Primera Instancia decidió que la información requerida en los incisos 1, 2, 3 y 5 del *subpœna* impugnado era pertinente para determinar si la PRC había incurrido en violaciones a la Ley de Monopolios. No obstante ordenó que se eliminara el inciso 4, por estar dicha información protegida por el artículo 18 de la Ley de detectives privados. En cuanto a los incisos restantes resolvió que el artículo 18 de la Ley de detectives privados no era un obstáculo para la producción de los documentos solicitados pues dicho artículo establece que ante una investigación gubernamental, se puede divulgar la información protegida por el estatuto.

Los recurrentes acudieron en apelación al Tribunal de Apelaciones. Allí no objetaron la decisión del Tribunal de Primera Instancia en cuanto a la aplicación de la excepción de la Ley de detectives privados. Su reclamo consistió en que la falta de expresión de los hechos concretos en que se basa la investigación no permite determinar la pertinencia de la información requerida o la legitimidad del requerimiento de información. El foro apelativo confirmó la decisión del Tribunal de Primera Instancia y concluyó

que de acuerdo al argumento de los recurrentes, un requerimiento de información formulado a través de una citación vendría obligado a cumplir con el requisito de causa probable que sólo aplica a los casos en que sea necesario una orden judicial de registro y allanamiento. El Tribunal de Apelaciones recalcó en su sentencia que la intervención con un ciudadano producida por un *subpœna* recibe una protección menor que la requerida para los registros o allanamientos. Por esas razones, dicho foro confirmó la sentencia del Tribunal de Primera Instancia.

Los recurrentes comparecieron ante este Tribunal mediante recurso de Certiorari, y reiteraron los argumentos expresados ante el Tribunal de Apelaciones en cuanto a que la OAM no incluyó en su *subpœna* la pertinencia de la documentación solicitada, los hechos concretos que motivaron su investigación a la PRC, ni los objetivos de la misma. Los recurridos plantearon que a pesar de que la OAM indicó que existían unas querellas contra la PRC, éstas nunca se presentaron ante el Tribunal de Primera Instancia, de manera que éste pudiera conocer el contenido y la naturaleza de las mismas para determinar si la investigación se llevaba a cabo conforme a derecho. Los recurrentes imputaron como error el que no se haya solicitado a la OAM que demostrara la legitimidad de su investigación. En cuanto a los *subpœnas* impugnados, alegaron que éstos no expresaban violación alguna en la que hubiese incurrido la PRC, tampoco contenían la fecha de la

ocurrencia de la alegada violación ni la fecha en que la OAM se enteró de la supuesta violación. Por estas razones los recurrentes arguyeron que los foros inferiores erraron al no exigirle a los recurridos que subsanaran dichas faltas en los *subpœnas* y al fundamentar su negativa en que por no tratarse de un registro o allanamiento, sino de un requerimiento de información, la protección constitucional es inferior.

Por su parte, los recurridos argumentaron que de acuerdo a la jurisprudencia que versa sobre los *subpœnas duces tecum et ad testificandum,* no se requiere la existencia previa de una querella o violación de ley, es suficiente que la investigación se realice para un propósito autorizado por ley. Adujeron que tampoco se requiere mostrar causa probable como en el caso de los registros y allanamientos, ya que según argumentaron, el requisito de razonabilidad requerido en los casos de registros y allanamientos se cumple detallando en forma adecuada, pero no excesiva, los documentos que se requieren. En fin, los recurridos alegaron que de acuerdo a los amplios poderes investigativos de las agencias, y según los límites constitucionales que la jurisprudencia ha impuesto a dichas facultades, los *subpœnas* emitidos cumplían con los requisitos de razonabilidad, pertinencia y necesidad establecidos en la jurisprudencia.

El 30 de marzo del 2001 este Tribunal emitió una Resolución denegando el recurso de Certiorari de los

recurrentes. En Reconsideración decidimos expedir el auto solicitado. Tras un detenido examen del expediente y del derecho aplicable, revocamos la sentencia recurrida y anulamos los *subpœnas* expedidos por la Oficina de Asuntos Monopolísticos. Se ordena devolver el caso al Tribunal de Primera Instancia para la continuación de los procedimientos.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta concurre con el resultado con opinión escrita. El Juez asociado Señor Fuster Berlingeri disiente sin opinión escrita. La Jueza Asociada señora Rodríguez Rodríguez no interviene.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Estado Libre Asociado de Puerto Rico representado por el Departamento de Justicia, Oficina de Asuntos Monopolísticos<br>        Demandante-recurrido<br><br>                v.<br><br>Saint James Security Services, Inc.; Luis Maldonado Trinidad, como Presidente de Saint James Security Services, Inc.; Nacional Investigation and Protection Group, Inc.; y Héctor M. Rivera Serrano, como Presidente de Nacional Investigation and Protection Group, Inc.<br>        Demandados-peticionarios<br><br><br>Puerto Rican Cement Company, Inc.<br>        Interventora | CC-2000-995 | *Certiorari* |

Opinión concurrente emitida por la Jueza Asociada SEÑORA FIOL MATTA


En San Juan, Puerto Rico, a 31 de julio de 2007.

El recurso ante nuestra consideración presenta una controversia que no ha sido atendida expresamente en nuestro ordenamiento, a saber, si en el caso de un *subpœna duces tecum* administrativo, dirigido a un tercero para que divulgue información suya a pesar de no ser el objeto de la investigación, se requiere explicitar la pertinencia de la información requerida. Por eso, si bien me parece atinada la disposición que de este caso ha hecho la Mayoría,

entiendo que debimos examinar a fondo los criterios aplicables a las investigaciones administrativas frente a reclamos de terceros basados en las garantías constitucionales contra citaciones, allanamientos y registros irrazonables, con miras a elaborar las guías que requiere dicha actuación gubernamental.

I

En Puerto Rico, el desarrollo doctrinario y jurisprudencial en materia de derecho administrativo tiene como origen la doctrina y la jurisprudencia estadounidense. A través de los años, éstas se han seguido usando como referente por las posibles correspondencias que un origen común pueda brindar, siempre que sean compatibles con nuestro acervo legal. Resulta útil comparar el desarrollo jurídico de la doctrina sobre investigaciones administrativas y el uso de *subpœnas duces tecum* en ambas jurisdicciones.

El tratadista norteamericano Bernard Schwartz, nos explica la importancia de la información para el funcionamiento de las agencias administrativas con estas palabras:

> Information is the fuel without which the administrative engine could not operate; the old saw that knowledge is power has the widest application in administrative law. To exercise its substantive powers of rule making and adjudication intelligently, the agency must know what is going on in the area committed to its authority. Schwartz, Administrative Law, 3ra ed., 1991, p. 110,

Aunque es común que las agencias obtengan información de manera voluntaria, con frecuencia se les delega mediante legislación el poder de obligar a las personas a que les suministren la información que necesiten. H.M.C.A. (P.R.), Inc., etc. v. Contralor, 133 D.P.R. 965, 968-969 (1993). El poder de investigación es para Schwartz, *op. cit.*, p. 178 el modo mediante el cual una agencia puede asegurar la consecución de la información necesaria para el uso racional de sus poderes sustantivos.

El poder de requerir información de manera coercitiva incluye el poder de citar testigos y el de requerir la producción de documentos. A ese poder se le denomina también como el poder de *subpoena ad testificandum*, cuando se requiere meramente testimonio, o *subpoena duces tecum*, cuando se requiere que se comparezca ante la agencia para producir documentos. H.M.C.A. (P.R.), Inc., etc. v. Contralor, *supra*.

Las citaciones administrativas que se utilizan para obtener información en el curso de una investigación son instrumentos vitales para que las agencias puedan cumplir las funciones que se les encomiendan. H.M.C.A. (P.R.), Inc., etc. v. Contralor, *supra*. Schwartz recalca que sin el poder para emitir *subpœnas*, el poder de investigación administrativo queda subordinado al consentimiento del investigado. Sobre la naturaleza e importancia de ese instrumento investigativo el autor expresa lo siguiente:

> The *subpoena* power differs materially… from the power to gather data and make investigations.

> Without the *subpoena* that power is in effect a power of inspection at the employer's place of business to be exercised only on his consent… [T]he *subpoena* is in form an official command, and even though improvidently issued it has some coercive tendency. Schwartz, <u>Administrative Law: A Case Book,</u> 4^(ta) ed., 1994, pág. 199.

A mediados del siglo pasado, en tiempos de guerra, las agencias administrativas jugaron un papel central en la estabilización económica y social de los Estados Unidos, regulando la producción industrial, los salarios y los precios. Ello, según explica Davis, requirió cambios constitucionales profundos que el Tribunal Supremo estadounidense, con un criterio contrario a años anteriores, no titubeó en realizar.[1] El caso de <u>Endicott Johnson v. Perkins</u>, 317 U.S. 501 (1943), marcó una nueva época para las agencias del ejecutivo. En dicho caso, la agencia gubernamental emitió un *subpœna* contra una compañía alegando tener "razones para creer" que ésta había incurrido en violaciones a la ley custodiada por la agencia. La compañía alegó que la información solicitada no era pertinente a las determinaciones que la Secretaria de la agencia estaba facultada a hacer según el estatuto orgánico. El Tribunal Supremo resolvió que era a la Secretaria a quien le competía determinar la pertinencia de

---

[1]En palabras del tratadista:

> … if the Constitution stood in the way, as it unquestionably did, the Constitution would have to be changed… The Justices of the Supreme Court dutifully carried out the unmaking and the remaking. <u>Administrative Law Treatise</u>, 2^(da) ed., Vol. I, K.C. Davis Pub. Co., California, 1978, págs. 228-299.

la información requerida. Su discreción era amplia en la medida en que la evidencia no fuera evidentemente impertinente (*plainly incompetent or irrelevant*) a los fines que le estaban encomendados legalmente. Inclusive, el Tribunal Supremo expresó que el tribunal apelado no tenía autoridad para dilucidar el asunto concerniente a la envergadura de la investigación.[2]

La opinión del Tribunal Supremo estadounidense en Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186 (1946), dejó claro que la norma expuesta en Endicott Johnson v. Perkins, *supra*, era de aplicación general, y constituía la nueva doctrina sobre el alcance del poder investigativo de las agencias federales. Además, dicha opinión manifestó que un *subpœna* no constituye un registro o un allanamiento, limitándose por tanto la protección constitucional ofrecida por la Enmienda Cuarta a que el requerimiento no sea demasiado indefinido o amplio, que la agencia esté autorizada por ley a requerir información y que la información requerida sea pertinente. En fin, el requerimiento no puede ser irrazonable. Oklahoma Press Publishing Co. v. Walling, *supra*, p. 195.

Los precedentes doctrinarios anteriores a Endicott y Oklahoma Press, diametralmente contrarios a esta nueva

---

[2] Este criterio era diametralmente opuesto al que sostuvo el Tribunal Supremo estadounidense a principios del siglo pasado, cuando resolvió que una orden para producir información podría constituir un registro y allanamiento irrazonable bajo la Constitución federal. Hale v. Henkel, 201 US 43, 76 (1906).

doctrina, estaban tan firmemente establecidos que las cortes inferiores se rehusaron por un tiempo a descartarlos. Davis relata que para ello se requirió el ejercicio pleno de la autoridad del Tribunal Supremo. El caso de United States v. Morton Salt, 338 US 632, 641-642, 652 (1950) puso fin al repudio que había manifestado el Tribunal Supremo de los Estados Unidos en décadas anteriores en torno a las llamadas "expediciones de pesca", permitiéndolas incluso para satisfacer una "curiosidad" de la agencia.

La amplitud conferida jurisprudencialmente a la facultad investigativa de las agencias eliminó cualquier requisito de causa probable y dejó a discreción del jefe de las agencias el aspecto de la pertinencia de la información. La discreción de la agencia quedó circunscrita sólo por los criterios establecidos en Oklahoma Press Publishing Co., *supra*., es decir, que la información sea pertinente a la investigación y el alcance del requerimiento sea lo razonablemente necesario.[3] La determinación de pertinencia se basa en la relación de lo

---

[3] Davis nos explica que:

> An agency with power to investigate may make an investigation that is as broad as it reasonably finds to be appropriate, but a demand for information must be relevant to the investigation and may not be broader than is reasonably necessary. The breadth of an investigation is for the investigators to determine. The breadth of a subpoena or of a search made in records may be excessive, but the test is relevance to the specific purpose, and the purpose is determined by the investigators. Davis, *op. cit.*, p. 271.

requerido al propósito de la investigación, el cual a su vez, descansa en la sana discreción del investigador.

Según Davis el cambio en la connotación de los conceptos "registro irrazonable" y "auto incriminación" en el contexto de las investigaciones administrativas ocurrió sin explicación alguna.  Por eso el tratadista alega que los cambios doctrinales se basaron en cambios de política pública para los cuales el Tribunal Supremo no acostumbra brindar explicación: "the Supreme Court in its opinions on the administrative power of investigation customarily avoids any discussion of broad reasons of policy."  Davis, *op. cit*, p. 236.

En el caso de Oklahoma Press Pub. Co. v. Walling*, supra,* se estableció que un requerimiento para la producción de documentos, a pesar de ser un registro implícito[4], no es propiamente un registro o un allanamiento bajo el significado clásico de la Cuarta Enmienda de la Constitución de Estados Unidos.  Pero en See v. City of Seattle, 387 U.S. 541, (1967), el Tribunal Supremo de los Estados Unidos determinó que las protecciones de la Cuarta Enmienda se extienden a los *subpœnas*.  El caso de U. S. v. Miller, 425 U.S. 435 (1976), aclaró que una orden o *subpœna* para la producción de libros y papeles puede constituir un registro o allanamiento irrazonable dentro de la Cuarta enmienda si el alcance de dicha producción es demasiado amplio.

---

[4] El Tribunal Supremo de los Estados Unidos le llama "constructive search".

En Puerto Rico, el desarrollo doctrinario sobre las investigaciones administrativas a través de requerimientos de información o *subpœnas duces tecum,* comenzó a forjarse a la luz de lo resuelto por los tribunales estadounidenses. En <u>Cooperativa Cafeteros de Puerto Rico v. Ramón Colón Torres,</u> *et al*, 84 D.P.R. 278 (1961), adoptamos la norma formulada jurisprudencialmente por el Tribunal Supremo de los Estados Unidos a los efectos de otorgarle amplios poderes de investigación a las agencias.   En ese caso, el Inspector de Cooperativas solicitó de Cafeteros de Puerto Rico una extensa información relacionada con las operaciones de esa cooperativa.  La información solicitada debía estar incluida en un informe requerido por la Ley de Cooperativas que el demandado había dejado de completar. Así lee la traducción que hiciéramos en ese caso de la norma tomada de <u>United States v. Morton Salt Co.</u>, 338 U. S. 632 (1950):

> Aún si consideramos la información solicitada en este caso como motivada meramente por la curiosidad oficial... los organismos llamados a hacer cumplir las leyes tienen el legítimo derecho de cerciorarse de que las corporaciones actúan de acuerdo con la ley y con el interés público.  Desde luego una investigación gubernamental de los asuntos de una corporación puede ser de una naturaleza tan abarcadora y tan no relacionada con la materia bajo investigación que exceda el poder de investigación. <u>Federal Trade Comm'n v. American Tobacco</u>, supra. **Pero es suficiente si la investigación está dentro de la autoridad de la agencia, el requerimiento no es demasiado indefinido y la información solicitada es razonablemente pertinente.** La esencia de la

protección consiste en el requisito, expresado en forma concreta, de que la divulgación requerida no sea irrazonable'. Oklahoma Press Publishing Co. v. Walling, 327 U. S. 186, 208. Cooperativa Cafeteros de Puerto Rico v. Colón, *supra*, 285. Énfasis nuestro.

Luego de exponer el citado fragmento, aclaramos, que:

Desde luego, existen límites en cuanto a lo que, bajo el color de informes, puede exigir la Comisión. No intentamos definir en lo abstracto exactamente cuáles son estos límites. Pero podemos decir con certeza que tales límites impedirían que la Comisión llegara a los extremos del ejemplo extravagante que utilizó uno de los demandados para demostrar lo que teme que ocurra si sostenemos la validez de esta orden--que la Comisión puede requerir informes de las compañías de automóviles que incluyan archivar los automóviles. *Id.*

Quedaron asentados los criterios a ser considerados en nuestra jurisdicción al evaluar una controversia acerca del poder de investigación de las agencias, a saber, que la información solicitada esté dentro de la autoridad de la agencia, el requerimiento no sea demasiado indefinido y la información sea razonablemente pertinente.[5] Un requerimiento de información impugnado será respaldado si cumple "con lo que se ha sostenido es razonable requerir de un organismo sujeto a investigación y reglamentación de una agencia administrativa." Cooperativa Cafeteros de Puerto Rico v. Colón, *supra*, 286.

En Comisionado de Seguros v. Bradley, 98 D.P.R. 21 (1969), señalamos que lo determinante en cuanto a qué

---

[5] Véase también P.N.P. v. Tribunal Electoral, 104 D.P.R. 741 (1976).

documentos, récords, archivos y cuentas pueden ser examinados por una agencia es su pertinencia al asunto que es objeto de una investigación autorizada por la ley. [6] Indicamos que no es necesaria la presentación de una querella formal, de una demanda o de una acusación criminal, ya que el propósito de la investigación es precisamente averiguar si se ha violado la ley. Del resultado de la investigación puede depender si el organismo público concernido procede o no a la formulación de una querella, demanda o acusación. [7]

En esa opinión añadimos que la determinación sobre la pertinencia de la información requerida corresponde inicialmente al funcionario que realiza la investigación, por lo que concluimos que una persona o una corporación que está bajo investigación no puede colocarse en la posición de dar solamente la información que ella elija ofrecer. [8] Por otro lado, hemos precisado que son los tribunales, como intérpretes últimos de la compatibilidad del ejercicio del poder investigativo gubernamental con los postulados constitucionales, los llamados a dirimir las controversias

---

[6]Para fundamentar dicho dictamen recurrimos a <u>Detweiler Bros. v. Walling</u>, 157 F.2d 841, 843 (1946), certiorari denegado 330 U.S. 819 (1947).

[7] En esta ocasión decidimos como en <u>Link v. N.L.R.B.</u>, 330 F.2d 437 (1964) donde se dijo que "es irrazonable en extremo insistir en que el resultado esté disponible antes de comenzarse la investigación."

[8] Hemos reconocido que, por lo general, es la información que no se ofrece la que es de mayor pertinencia cuando se ha incurrido en prácticas ilegales. <u>Comisionado de Seguros</u>

sobre asuntos de pertinencia. De esa forma, en virtud de los poderes que la Constitución nos ha conferido, nos hemos preservado la facultad suprema para dirimir controversias sobre este asunto, como salvaguarda contra el amplio poder investigativo que hemos reconocido. Así aunque una agencia administrativa puede expedir una citación sin obtener antes una orden judicial, el requerido tiene derecho a cuestionar su razonabilidad en un tribunal antes de ser penalizado por su incumplimiento[9]. H.M.C.A. (P.R.), Inc., etc. v. Contralor, *supra*, págs. 970-971.

El poder inquisitivo de las agencias administrativas, sin dudas, puede convertirse en un instrumento de hostigamiento y persecución. Ver Schwartz, *op. cit*, pág. 110. Por eso aún cuando las agencias gocen de tan amplia facultad investigativa, su ejercicio no queda al margen de los postulados constitucionales que informan nuestro ordenamiento. H.M.C.A. (P.R.), Inc., etc. v. Contralor, *supra*, pág. 970.

Reiteradamente hemos reconocido que las interpretaciones que hace el Tribunal Supremo federal sobre el contenido de los derechos fundamentales conferidos por la Constitución de Estados Unidos sólo constituyen el mínimo de protección que debemos brindar a esos derechos al amparo de nuestra propia Constitución. Por eso, dichas

---

v. Bradley, *supra*, p. 34. Doctrina adoptada de N.L.R.B. v. United Aircraft Corp., 200 F.Supp. 48 (1961).

[9] Doctrina de Donovan v. Lone Steer, Inc., 464 U.S. 408, 415 (1984).

interpretaciones no limitan nuestra facultad para reconocer mayor amplitud a las garantías constitucionales conferidas por la Constitución de Puerto Rico. Así, hemos determinado que nuestra Constitución tiene una factura más ancha que la Constitución federal con respecto a derechos tales como la prohibición contra registros y allanamientos irrazonables. Empresas Puertorriqueñas de Desarrollo, Inc., v. Hermandad Independiente de Empleados Telefónicos, 150 D.P.R. 924, 948-949 (2000); H.M.C.A. (P.R.), Inc., etc. v. Contralor, supra.[10] La razón para ello es que la Constitución del Estado Libre Asociado "tiene un origen y un historial distinto a la Constitución de Estados Unidos... [n]uestra Constitución reconoce y concede unos derechos fundamentales con una visión más abarcadora y protectora que la Constitución de Estados Unidos". Emp. Pur. Des., Inc. v. H. I. E. Tel., supra; López Vives v. Policía de P.R., 118 D.P.R. 219, 226-227 (1987).

En ocasiones hemos puesto de manifiesto que la jurisprudencia estadounidense, en cuanto a los derechos fundamentales, sólo tiene valor persuasivo, ilustrativo y comparativo ya que nuestra percepción de los valores involucrados y el modo de conciliarlos pueden ser

---

[10] Véanse además Pueblo v. Meléndez Rodríguez, 136 D.P.R. 587 (1994); Pueblo v. Muñoz, Colón y Ocasio, 131 D.P.R. 965 (1992); Rodríguez Rodríguez v. E.L.A., 130 D.P.R. 562 (1992); Pueblo v. Rivera Colón, 128 D.P.R. 672 (1991); Pueblo v. Malavé González, 120 D.P.R. 470 (1988); Pueblo v. Falú Martínez, 116 D.P.R. 828, (1986); Pueblo v. Dolce, 105 D.P.R. 422 (1976).

enteramente distintos. Ojeda v. El Vocero de P.R., 137 DPR 315 (1994). Así lo hemos dispuesto al expresarnos sobre las garantías contra registros y allanamientos irrazonables. Pueblo v. Pérez Pérez, 115 DPR 827, (1984).

En H.M.C.A. (P.R.), Inc., etc. v. Contralor, *supra,* reiteramos el principio de que las investigaciones administrativas están sujetas, por norma general, a la garantía provista por la sección $10^{ma}$ del artículo II de la Constitución de Puerto Rico contra citaciones, allanamientos, registros e incautaciones irrazonables. E.L.A. v. Coca Cola Bott. Co., 115 D.P.R. 197, 206 (1984). Es incuestionable el hecho de que una investigación administrativa constituye una intervención del estado en los asuntos de las personas naturales o jurídicas que implica el acceso a sus casas, papeles o efectos. La jurisprudencia ha establecido distinciones entre los diversos métodos investigativos para efectos de determinar la razonabilidad de la intervención estatal (*e.g.* inspección, allanamiento, entrega de documentos, etc.). RDT Construction Corporation v. Ileana Colón Carlo, Contralor I, 141, D.P.R. 424, 433 (1996). Dicha intervención está limitada por los criterios de razonabilidad que garantiza nuestro texto constitucional y que a esos efectos hemos forjado. Las garantías desarrolladas a partir de esa limitación fundamental al poder gubernamental sustentan la norma claramente establecida que sujeta la razonabilidad de un requerimiento

administrativo o *subpœna duces tecum* a que concurran las tres circunstancias identificadas en la jurisprudencia antes explicada: que la investigación esté dentro de la autoridad conferida por ley a la agencia; que el requerimiento no sea demasiado indefinido, y que la información solicitada sea razonablemente pertinente al asunto específico bajo investigación. H.M.C.A. P.R.), Inc., etc. v. Contralor, *supra*, pág. 970; E.L.A. v. P.R. Tel. Co., *supra*, pág. 402; P.N.P. v. Tribunal Electoral, *supra*, págs. 747-748; Comisionado de Seguros v. Bradley, *supra*, pág. 31.

Ha quedado establecido que la determinación de causa probable no aplica al caso de requerimientos de documentos o *subpœnas*; aplica, sin embargo, en circunstancias donde se pretenda inspeccionar, incautar o allanar, ya que es necesaria la emisión de una orden judicial a tales efectos. Ya nos expresamos sobre ese particular en RDT Construction v. Colón Carlo I, *supra*, págs. 433-434; ELA v. Coca Cola Bottling, Co., *supra*. En el caso de los *subpœnas duces tecum*, como ya hemos mencionado, lo determinante es que la agencia u organismo inquisidor demuestre la pertinencia de la información solicitada. Dicho estándar es menor que el de causa probable.

En varias ocasiones hemos insistido en que al interpretar nuestra Constitución debemos garantizar la continuada vigencia de sus valores fundamentales frente a las nuevas realidades del país. Debemos evitar que

interpretaciones inflexibles y el apego a viejos modelos impidan su aplicabilidad a las eventualidades del futuro y en pocos años tornen obsoleta una constitución diseñada para guiar la vida de un pueblo por varios siglos. Al interpretar sus contornos, debemos garantizar su vigorosidad y relevancia a los problemas socioeconómicos y políticos de nuestro tiempo. Emp. Pur. Des., Inc. v. H. I. E. Tel., *supra*; Nogueras v. Hernández Colón, 127 D.P.R. 405, 411 (1990); Pacheco v. Vargas, Alcaide, 120 D.P.R. 404, 410 (1988); P.I.P. v. C.E.E., 120 D.P.R. 580, 613 (1988); López Vives v. Policía de P.R., 118 D.P.R. 219, 227 (1987). Es una realidad de la vida contemporánea que la mayor parte de los *subpœnas* emitidos para obtener documentación se dirigen a terceras partes que no son el objeto de la investigación administrativa[11]. Por esta razón, en RDT Construction v. Ileana Colón Carlo I, *supra*, rechazamos la aplicación de la doctrina estadounidense sobre privacidad donde el criterio aplicable era el de "posesión o propiedad" según United States v. Miller, 425 U.S. 435 (1976) y su progenie, y nos inclinamos por la vertiente anterior expuesta en Katz v. United States, 389 U.S. 347 (1967) que estableció el criterio de "expectativa razonable de intimidad". La necesidad de este enfoque se

---

[11] Véase W. R. La Fave, Search and Seizure, A Treatise on the Fourth Amendment, 1era ed., West, suppl. 2007, sec. 4.13 citando a Slobogin, Subpœnas and Privacy, 54 DePaul L. Rev., 805 (2005).

hace cada vez más patente con el creciente uso cotidiano de la tecnología informática por la ciudadanía.

En el caso de RDT Construction v. Ileana Colón Carlo I, *supra*, hicimos hincapié en la amplitud de los poderes investigativos del Contralor, habida cuenta de que se trata de una agencia que tiene rango constitucional con rasgos y poderes muy particulares que la distinguen de otras agencias administrativas.[12] H.M.C.A. (P.R.), Inc., etc. v. Contralor, *supra*, pág. 964; RDT Construction v. Colón Carlo I, *supra*, pág. 445. No obstante y a pesar de la amplitud de dichos poderes le conferimos una protección al investigado cuando su información se encuentre en poder de un tercero. Posteriormente, en RDT Construction v. Colón Carlo II, 141 D.P.R. 861, 863-864 (1996) aclaramos el mecanismo que establecimos en RDT Construction v. Colón Carlo I, *supra*, para asegurar que los tribunales tengan una oportunidad de evaluar la razonabilidad de un *subpœna* dirigido a un tercero y determinar su procedencia, si quien está siendo investigado decide impugnarlo. Dicho mecanismo consiste en notificar a la persona en quien se ha centrado la investigación cuando se le requiriera a un tercero la producción de documentos sobre los cuales el investigado alberga una expectativa de intimidad. En el caso de referencia se requirió la producción de documentos bancarios de una entidad corporativa.

---

[12] Ver la sección 22 del artículo III de la Constitución del Estado Libre Asociado de Puerto Rico.

Al definir los poderes investigativos de la Asamblea Legislativa, este Foro ha adoptado una postura similar a la que asumimos en cuanto al Contralor.[13] Por eso, en Rullán v. Fas Alzamora, 2006 TSPR 5, recalcamos que la facultad investigativa de la Legislatura es tan amplia como sea necesaria para cumplir la función legislativa, pero aclaramos, como antes lo hemos hecho, que no obstante su amplitud, dicha facultad no es absoluta y corresponde a este Foro demarcar sus contornos.[14] Aplicamos entonces el requisito de notificación a la gestión investigativa de la Asamblea Legislativa, y como discutiremos más adelante, ampliamos la protección que dicha notificación brinda al investigado.

Así, ante la presencia de un tercero en la gestión investigativa de unos organismos ampliamente facultados por la Constitución, hemos erigido protecciones adicionales a las desarrolladas en la doctrina tradicional sobre requerimientos de información. De ello se desprende que en el caso de agencias con poderes investigativos otorgados estatutariamente podemos exigir salvaguardas más rigurosas

---

[13] Véase H.M.C.A. (P.R.), Inc. v. Contralor, *supra*, pág. 964Allí reiteramos que en el ejercicio de su facultad y deber de fiscalizar la ejecución de la política pública y a los jefes de Departamento, la Asamblea Legislativa goza de vastos poderes de investigación (…) Esos poderes son inseparables de la facultad de legislar. Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576, 590 (1983).

[14] Peña Clos v. Cartagena Ortiz, supra, pág. 591; Hernández Agosto v. Betancourt, 118 D.P.R. 79, 82 (1986).

para ceñir la acción administrativa a los imperativos constitucionales que ya hemos expuesto.

Los hechos que provocaron nuestras opiniones en H.M.C.A. (P.R.), Inc. v. Contralor, *supra*, y RDT Construction v. Colón Carlo I, *supra*, son distinguibles de los del caso de autos, pues implicaban *subpœnas* requiriendo a un tercero la divulgación de información perteneciente a quienes eran el objeto de la investigación. En la controversia que hoy nos ocupa, la OAM solicita la entrega de documentos pertenecientes a los recurrentes, quienes son terceros en la investigación sobre la PRC. Como se desprende de la marcada tendencia jurisprudencial, cuando la información requerida le pertenece a un tercero, la protección judicial ante la intervención gubernamental se torna imperante.

En nuestra jurisdicción las agencias con poderes inquisitivos pueden requerir información perteneciente a terceros en quienes no se ha centralizado la investigación administrativa. En Comisionado de Seguros v. Bradley, *supra,* pág. 33, habíamos indicado que el poder investigativo del Comisionado de Seguros no se interpreta restrictivamente para limitarlo a operaciones de seguros propiamente dichas, ni tampoco se limita a compañías dedicadas a seguros, sino que, cuando las circunstancias lo justifican, puede extenderse a otras entidades o empresas

que hayan tenido relaciones comerciales o económicas con compañías de seguros.[15]

A tales efectos declaramos que tratándose de una investigación válidamente hecha por un organismo público dentro del ámbito de la autoridad conferida por ley, el hecho de que determinados papeles pertenezcan a un tercero no los pone fuera del alcance de la investigación.[16] Según este razonamiento, establecimos que si un tercero no puede oponerse a revelar datos que estén dentro del ámbito del poder investigativo del organismo público (por estar relacionados con el asunto o la materia sobre el cual el organismo tiene jurisdicción), menos puede oponerse a ello una persona o una entidad que está claramente bajo la jurisdicción del organismo investigador. A pesar de conferir tal amplitud investigativa a las agencias administrativas, no tuvimos la oportunidad de demarcar los lindes constitucionales de la facultad para requerir información a terceros que no son propiamente el objeto de la investigación de la agencia.

En Rullán v. Fas Alzamora, supra, se le "notificó" al investigado acerca de un subpœna expedido al Secretario de Hacienda requiriendo sus documentos contributivos. Resolvimos que dicha notificación no cumplía con los requisitos constitucionales de razonabilidad. Establecimos

---

[15] Bankers Life and Casualty Co. v. McCarthy, 137 N.E.2d 398 (1956) y Commissioner of Insurance v. The First National Bank of Boston, 223 N.E.2d 684 (1967).

que era necesario explicitar en la notificación, de manera específica y detallada, las razones por las cuales una comisión creada para investigar a la WIPR necesitaba las planillas contributivas de su ex asesor legal. Respecto a esto, nos hicimos la siguiente pregunta:

> **¿No era razonable que el referido requerimiento señalara al contribuyente en forma específica y detallada las razones por las cuales, la comisión legislativa diseñada y creada con el propósito de investigar la situación existente en la W.I.P.R., necesitaba copias de sus planillas para lograr ese fin? Entendemos que no sólo era razonable, sino imprescindible,** por imperativo del derecho constitucional a un debido proceso de ley… el Tribunal de Primera Instancia debió exigir al Senado de Puerto Rico que demostrara la razonabilidad y pertinencia del requerimiento dirigido al Secretario de Hacienda por una de sus comisiones.

A lo anterior debemos añadir que existe una distinción entre una orden de producción de documentos o *subpœna* emitido con fines puramente civiles y un *subpœna* con fines penales. Hemos establecido que cuando se trate de *subpœnas* tendentes a conseguir la información para una acusación criminal, se debe cumplir **estrictamente** con todas las salvaguardas establecidas a la luz de las normas constitucionales. RDT Construction v. Colón Carlo I, *supra*, pág. 445. En el caso de un *subpœna* mediante el cual se pretende conseguir información para hacer acusaciones criminales, es imperativo que el cumplimiento de los

---

[16] Application of Waterfront Commission of New York Harbor, 160 A.2d 832 (1960) y Pope & Talbott, Inc. v. Smith, 340 P.2d 960 (1959).

requisitos constitucionales de los *subpœnas* surja claramente de su texto.

Cabe recordar que la protección consagrada en la sección 10<sup>ma</sup> del artículo II de la Constitución de Puerto Rico se extiende también a las corporaciones privadas, aunque el ámbito de la intimidad reconocido a éstas es menor que el de las personas naturales. RDT Construction Corporation v. Ileana Colón Carlo, Contralor I, *supra*, 435 (1996); E.L.A. v. Coca Cola Bott. Co., *supra*, 209.[17] Por ello, entiendo que cuando el *subpœna* está dirigido a descubrir información perteneciente a terceros que son personas naturales, es imperativo considerar los asuntos sobre privacidad y auto incriminación que dicho requerimiento pueda suscitar. Bajo esas circunstancias, nuestra facultad revisora adquiere mayor rigurosidad, por lo que si el tercero es una persona natural, la agencia debe hacer **alegaciones específicas** que impliquen al tercero con el objeto de la investigación administrativa. Dicho *subpœna* debe estar sujeto a un escrutinio más exigente aquel que se dirija a una persona jurídica.

---

[17] Aún cuando las corporaciones pueden y deben estar protegidas de requerimientos ilegales hechos so pretexto de una investigación pública, éstas no pueden reclamar que se les equipare a los individuos en el disfrute del derecho a la privacidad. Ellas poseen atributos públicos. Tienen un impacto colectivo sobre la sociedad, de la cual derivan el privilegio de actuar como entidades artificiales. Los favores del Gobierno frecuentemente conllevan una mayor medida de reglamentación. Cooperativa de Cafeteros v. Colón, *supra.*

De acuerdo a lo antes expuesto, aprovecharía la coyuntura que nos brinda este caso para establecer que cuando una entidad gubernamental con poderes inquisitivos emita un *subpœna duces tecum* con fines penales a un tercero en quien no se ha centrado la investigación, el requerimiento deberá exponer en forma específica y detallada, la pertinencia y la necesidad de los documentos requeridos. Es decir, cuando la información requerida en un *subpœna* con fines penales pertenezca a un tercero que no es el objeto de la investigación, no es suficiente que el requerimiento se justifique con las mismas razones que servirían para justificar un *subpœna* con fines penales dirigido al objeto de investigación. En la evaluación de un *subpœna* dirigido a un tercero se debe aplicar un estándar más riguroso que el de mera pertinencia. El tercero tiene derecho a conocer las razones por las cuales se le está requiriendo una información que le pertenece en el contexto de una investigación que no está centrada en su figura, o que al menos no aparenta estarlo. En esas circunstancias, la agencia debe explicar las razones para requerirle la información objeto del *subpœna* dentro del marco de la investigación.

II

A tono con la política de industrialización que comenzó en Puerto Rico a finales de la década de los cuarenta para estimular la inversión privada, y ante la consecuente expansión industrial y económica que se

manifestó a principios de la década de los sesenta[18], se aprobó la Ley Núm. 77 del 25 de junio de 1964, conocida como Ley para prohibir prácticas monopolísticas y proteger la justa y libre competencia en los negocios y el comercio. 10 L.P.R.A. secs. 257 *et seq.* Esta ley tiene como norte la concepción de un sistema democrático que asegure la libre participación del ciudadano en las decisiones colectivas.[19] Según su exposición de motivos, es incompatible con tal

---

[18] Ver Henry Wells, La modernización de Puerto Rico, (Pedro G. Salazar), 1era ed., México, Editorial Universitaria de la UPR, 1972.

[19] Nos parece pertinente, para fines de comprender el marco histórico dentro del cual se promulgó dicha ley, recordar las palabras de ELA v. Rosso, 95 D.P.R. 501, 529, esc. 10 (1967) citando al Papa Juan XXIII, sobre la intervención del poder público en el campo económico:

> …[en] este campo deben estar activamente presente los poderes públicos "a fin de promover debidamente el desarrollo de la producción en función del progreso social en beneficio de todos los ciudadanos." Su acción debe inspirarse en el principio de su misión subsidiaria. Los poderes públicos, responsables del bien común, deben sentirse obligados "a desenvolver en el campo económico una acción multiforme, más vasta, más profunda y más orgánica, como también a ajustarse a este fin en las estructuras, en las competencias, en los medios y en los métodos."
>
> Pero se afirma el principio que la presencia del Estado en el campo económico, por dilatada y profunda que sea, no se encamina a empequeñecer la esfera de la libertad en la iniciativa de los ciudadanos particulares, sino antes a garantizar a esa esfera la mayor amplitud posible, "tutelando efectivamente, para todos y cada uno, los derechos esenciales" de la persona, lo cual implica que en los sistemas económicos esté permitido y facultado el libre desarrollo de las actividades de producción. Donde falta la iniciativa personal de los particulares hay estancamiento de los sectores económicos

…aspiración democrática la concentración del poder económico en unas pocas personas y entidades, en forma tal que éstas se coloquen en posición de dominar áreas o sectores de la economía puertorriqueña mediante manipulaciones que desdeñen el bienestar del pueblo en aras del lucro desmesurado de esas personas y entidades. Tiene que asegurarse el pueblo de [*sic*] que no han de germinar en Puerto Rico esas concentraciones de poder económico, para no correr el riesgo de que toda la vida económica del país pueda quedar a merced de un grupo reducido de personas que actúen movidas por un interés privado. Ante una situación de tal naturaleza, es difícil concebir que las decisiones colectivas vayan a tomarse verdaderamente a base de la libre participación de todos los ciudadanos.

En torno a los valores que establece este enunciado, la Ley núm. 77 protege al pueblo asegurándole los beneficios de la libre competencia. Por tal razón en la aplicación de la ley, como prescribe el legislador, "…deberá tenerse en cuenta que su objetivo final es proscribir males que amenazan la economía general de la Isla…" Exposición de motivos, *supra*.

El Informe conjunto sobre el Sustitutivo P. de la C. 909 sometido por las Comisiones de lo Jurídico, de Hacienda y de Comercio e Industria de la Cámara de

---

destinados a producir tanto los bienes de consumo y de servicios de las necesidades materiales, sino también los de las exigencias del espíritu. "Por otro lado, donde falta o es defectuosa la debida actuación del Estado, reina un desorden irremediable, abuso de los débiles por parte de los fuertes menos escrupulosos, que arraigan en todas las tierras y en todos los tiempos, como la cizaña entre el trigo."

Representantes[20], recomendando la aprobación del proyecto que se convirtió en la Ley Núm. 77 declara que se debe:

> [p]roveer una base flexible para la propia ejecución de la ley, basada en una norma de razonabilidad que permita a nuestros tribunales tomar en cuenta las características propias y las necesidades de nuestra economía, así como los planes gubernamentales y al acción privada para fomentarla; es decir, queda abierta la función creadora en la aplicación de la ley, tanto en la rama ejecutiva como en la judicial en sentido favorable a nuestro desarrollo económico, aún en el caso de disposiciones con precedentes en la legislación de los Estados Unidos.

En P.R. Fuels, Inc. v. Empire Gas Co., Inc., 149 DPR 691, 706-708 (1999) explicamos que si bien nuestra legislación antimonopolística se adoptó a la luz de la Ley Sherman[21] y de la Ley Clayton[22], no estamos obligados a seguir ciegamente la interpretación de estas leyes elaboradas por los tribunales federales. La doctrina que hemos reiterado en nuestras decisiones respecto a la interpretación de leyes copiadas o adoptadas de otras foráneas es, como sabemos, que se puede acudir a las jurisdicciones de origen cuando ello es necesario para la interpretación adecuada de las normas así adoptadas. Este Tribunal siempre puede escoger otra norma, extranjera o de confección propia, que considere más equitativa, inclusive puede expandir los derechos garantizados en la jurisdicción de origen. Por sus adecuadas palabras, nos remitimos

---

[20] 18 Diario de Sesiones de la Asamblea Legislativa 1425 (1964).

[21] 15 U.S.C.A. secs. 1-7.

[22] 15 U.S.C.A. secs. 12- 19, 21-27; 29 U.S.C.A. secs. 52-53.

respecto a esta doctrina de interpretación a nuestra decisión en Berrocal v. Tribunal de Distrito, 76 D.P.R. 38 (1954), donde nos pronunciamos de la siguiente manera:

> [A]parte de nuestra libertad de acción ante precedentes que no son productos de nuestra propia jurisprudencia, una decisión judicial no es exclusivamente un cotejo más o menos científico de los antecedentes judiciales. Una decisión judicial es además la creación de una norma jurídica que se ajuste al estilo de vida de un pueblo, entendiendo por estilo de vida el sistema de superaciones individuales que van integrando paulatinamente el *ethos* colectivo de un pueblo.

En la jurisprudencia que interpreta la Ley núm. 77, hemos sido enfáticos al expresar que fue la intención de la Asamblea Legislativa que la Ley núm. 77 se interpretara conforme a nuestra particular realidad económica y social. Pressure Vessels P.R. v. Empire Gas P.R., 137 D.P.R. 497, 508 (1994). Es por ello que, aunque es útil recurrir a la jurisprudencia federal que interpreta las leyes orgánicas de agencias federales análogas a las nuestras, no podemos aplicarlas ciegamente, más bien tenemos que considerar la naturaleza de la controversia y los derechos comprometidos, pues es indispensable aclimatar a nuestro ambiente jurídico los precedentes que otras jurisdicciones han formulado.

Como apuntáramos anteriormente, en nuestra jurisdicción rige en materia constitucional una visión más abarcadora y protectora que en la jurisdicción federal. A través de dicha "perspectiva de rigor", analizaremos la razonabilidad de los *subpœnas* impugnados atendiendo los aspectos que conforman la constitucionalidad del *subpœna*.

La Legislatura le proporcionó a la Oficina de Asuntos Monopolísticos la facultad de expedir citaciones o requerir información o documentos pertinentes a las investigaciones que conduzca. El Art. 15(2) de la Ley Núm. 77 de 25 de junio de 1964, 10 L.P.R.A. sec. 272, prescribe que:

Bajo la dirección del Secretario Auxiliar, la Oficina de Asuntos Monopolísticos puede:

> Compilar y ordenar información sobre las prácticas competitivas en el mercado de Puerto Rico y sobre la relación de éste con los mercados de Estados Unidos y del extranjero, con el fin de determinar cuáles prácticas conllevan restricciones al libre comercio y propenden a la indebida concentración del poder económico, y requerir de cualquier persona, según se define dicho término en este capítulo, aquellos informes que se consideren necesarios a tales fines, debiéndose prescribir por reglamento los períodos que cubrirán dichos informes, así como la forma y el contenido de los mismos. Dichos informes podrán requerir, no sólo información interna con relación a la persona afectada, sino también información pertinente a las relaciones comerciales de ésta con otras personas (…)[23] (Énfasis suplido.)

El Reglamento núm. 974 del 27 de abril de 1965, conocido como Reglamento núm. 2 para ejecución de la Ley núm. 77 de 25 de junio de 1964, se promulgó precisamente para

> …facilitar la compilación y ordenación de información sobre las practicas competitivas en el mercado de Puerto Rico y sobre la relación de

---

[23] El artículo 12 de la Ley núm.77, 10 L.P.R.A. sec. 268, al utilizar el término "persona perjudicada" se refiere a "aquella persona natural o jurídica que sea perjudicada en sus negocios o propiedades por otra persona, por razón de actos, prohibidos o declarados ilegales" por la Ley núm.77. Es decir, de una lectura íntegra de los cuerpos legales bajo estudio, el artículo 15(2), 10 L.P.R.A. 272, sólo autoriza la investigación de las relaciones comerciales de la persona afectada por las prácticas monopolísticas del querellado.

éste con los mercados de Estados Unidos y del extranjero, con el fin de determinar cuáles practicas restringen o pueden restringir el libre comercio y propenden a la indebida concentración del poder económico. *Id.*, artículo 2.

La sección 4 del Reglamento núm. 974 dispone que:

Toda persona deberá rendir los informes que la Oficina de Asuntos Monopolísticos del Departamento de Justicia considere necesarios para los fines descritos en el Artículo 2 precedente.  7 RPR sec. 120.582.

Por su parte, la sección 5 del Reglamento establece que:

La Oficina de Asuntos Monopolísticos del Departamento de Justicia podrá requerir no sólo la información interna **con relación a la persona afectada**[24] sino también información pertinente a las relaciones comerciales de ésta con otras personas.
La Oficina de Asuntos Monopolísticos podrá interrogar acerca de la estructura de la empresa de **la empresa o negocio bajo estudio**; naturaleza del producto; estructura y rendimiento del mercado; conducta de la empresa y sobre cualquier otro indicador necesario para determinar cuáles prácticas restringen o pueden restringir el libre comercio y propenden a la indebida concentración del poder económico. 7 RPR sec. 120.583 (Énfasis suplido.)

El Reglamento núm. 975 del 25 de junio de 1965, también conocido como Reglamento núm. 3 para la ejecución de la Ley núm. 77 del 25 de junio de 1964 presenta dos tipos de citación y requerimiento de documentos, la citación penal y la citación civil.  El tipo de citación depende de las violaciones a la Ley que se pretenden investigar y la naturaleza del castigo que proceda.

A la PRC se le investiga por alegadamente haber incurrido en actos para restringir el comercio, que según

---

[24] Ver nota al calce núm. 22, *supra*.

el artículo 2 de la Ley núm. 77 implica "[t]odo contrato, combinación en forma de *trust* o en otra forma, o conspiración para restringir irrazonablemente los negocios o el comercio en el Estado Libre Asociado de Puerto Rico o en cualquier sector de éste"... art. 2 10 L.P.R.A. sec. 258 (bastardillas nuestras). Según la misma disposición "…toda persona que haga tales contratos o se comprometa en tales combinaciones o conspiraciones incurrirá en delito menos grave."

Las querellas presentadas en contra de PRC también imputan infracción al artículo 4 sobre monopolios. Según éste:

> Toda persona que monopolice o intente monopolizar o que se combine o conspire con cualquier otra persona o cualesquiera otras personas con el objeto de monopolizar cualquier parte de los negocios o el comercio en el Estado Libre Asociado de Puerto Rico, o en cualquier sector de éste, será considerada culpable de un delito menos grave. 10 L.P.R.A. sec. 260.

El artículo 10 de la Ley, núm. 77 regula las penalidades impuestas por las violaciones a sus disposiciones y prescribe que:

> Cualquier persona que viole las secs. 258, 260, 263(f) o 264 de este título será culpable de delito menos grave y convicta que fuere será castigada con una multa que no será menor de cinco mil (5,000) dólares ni mayor de cincuenta mil (50,000) dólares, o con prisión que no excederá de un (1) año o con ambas penas a discreción del tribunal. 10 L.P.R.A. sec. 266.

Evidentemente **el caso de autos trata sobre una citación criminal** pues las actividades imputadas a la PRC son castigadas criminalmente por la Ley núm. 77. Con

respecto a este tipo de citación, el Reglamento núm. 975, en su artículo 5, manda lo siguiente:

> Citación Penal–
> Los abogados adscritos a la Oficina de Asuntos Monopolísticos podrán citar como testigo a cualquier persona. Toda persona citada por los susodichos abogados estará obligada a comparecer y a testificar o a presentar libros, archivos, correspondencia, documentos y todo tipo de evidencia que se le requiera en cualquier investigación, procedimiento o proceso criminal relacionado con la Ley.

### III

Ya hemos resaltado que debido a nuestro tamaño territorial, relación política y vivencias sociales, nuestra economía se ha caracterizado por ser relativamente reglamentada y dirigida por el gobierno. *General Gases & Supplies Corp. v. Shoring & Forming Systems, Inc.*, 153 D.P.R. 869 (2001). Aún cuando el devenir histórico trastoque el propósito e intensidad del intervencionismo gubernamental con la empresa privada, no tenemos duda de lo primordial que resulta ser una agencia ejecutiva dedicada a la auscultación comercial y económica en un sistema económico liberal como el nuestro. Por ello, hemos afirmado que el tipo de economía que sirvió de contexto a la aprobación de la Ley núm. 77 hace aún más necesario que los tribunales diluciden de forma flexible los conflictos que surjan bajo su cobertura. *General Gases & Supplies Corp. v. Shoring & Forming Systems, Inc.*, *supra*. Por otra parte, el que se haya establecido un criterio de interpretación flexible no significa que debemos ignorar

las garantías constitucionales que protegen a todas las personas, tanto naturales, como jurídicas.

Consideremos cada uno de los requisitos constitucionales aplicados a los requerimientos de información emitidos en el caso de autos. De la exposición de estatutos y reglamentos de la OAM reseñados se colige el amplio poder delegado a esta oficina para llevar a cabo sus funciones fiscalizadoras en nuestro comercio. El poder para emitir *subpœnas duces tecum* y *subpœnas ad testificandum* surge claramente de la letra de la Ley núm. 77. Dicho poder expresamente otorgado se ha extendido mediante reglamentos, creados por la propia agencia para ejecutar la Ley núm. 77, al punto en que se dispone para el mecanismo de los requerimientos de información a terceras personas naturales o jurídicas.

Hemos visto que la información requerida en el *subpœna*, según manda nuestra Constitución, debe estar definida. Como anteriormente discutiéramos, la vaguedad o la excesiva amplitud en el requerimiento constituyen características que convierten al *subpœna duces tecum* en un registro o incautación irrazonable. En el presente caso, a pesar de la amplitud del *subpœna,* no tenemos reparo en declararlo lo suficientemente definido y particularizado. En ello concuerdo con los foros de primera instancia y apelativo.

Ahora bien, el *subpœna* también debe requerir información que sea pertinente al asunto bajo

investigación. La OAM ha emitido un requerimiento de información en el que expresa que está llevando a cabo una investigación sobre posibles prácticas monopolísticas en la industria del cemento. Esto no es suficiente. Cuando una agencia investigativa requiera información perteneciente a un tercero como parte de una inquisición con fines penales, ésta debería expresar en el *subpœna* las razones para hacerle dicho requerimiento. No creo que sea suficiente que se exprese el delito o infracción por el cual se investiga al objeto de la investigación. No se puede pretender que el propósito de la investigación, así como la pertinencia y materialidad de la información solicitada se deduzca de la información requerida.

Los recurrentes son compañías que han brindado sus servicios de seguridad a la PRC, en ellos no se ha enfocado la investigación, o al menos no surge del *subpœna* que éstos estén bajo el escrutinio investigativo de la OAM. Como bien señala la Mayoría, al examinar detenidamente el *subpœna* impugnado, no surge del mismo cuál es la pertinencia de la información requerida. El expediente tampoco revela de qué manera la información requerida por la OAM es pertinente al objetivo de su investigación. Si bien es cierto que la información requerida puede ser pertinente al asunto bajo investigación por estar relacionada a la PRC, también es cierto que este *subpœna* con fines penales pretende descubrir información perteneciente a los recurrentes, quienes no son el objeto de la investigación.

El Tribunal de Apelaciones concluyó que la petición de los recurrentes, en cuanto a que la OAM expresara hechos particulares que establecieran la pertinencia del requerimiento era improcedente, pues un requerimiento de información no tiene que cumplir con el requisito de causa probable. No tiene razón. Exigir que se expresen en un *subpœna* con fines penales las razones por las cuales un tercero, quien no es el objeto de la investigación de una agencia, debe someter información propia, entre ésta contratos[25], no implica una determinación de causa probable.

A pesar de que, por norma general, los funcionarios son quienes preliminarmente determinan la pertinencia de la información requerida en una investigación administrativa, somos los tribunales quienes por mandato constitucional estamos llamados a evaluar dicha determinación ejecutiva. Los *subpœnas* emitidos por la OAM no nos permiten ejercer esta facultad pues carecen de los elementos mínimos atinentes a la pertinencia de lo solicitado en la investigación administrativa. Por tal razón, concurro con el resultado que acordó la Mayoría.

Liana Fiol Matta
Jueza Asociada

---

[25] Como es sabido, un contrato contiene la expresión de la voluntad de los contratantes. Aún cuando reconocemos que a las corporaciones no les cobija el derecho a no auto incriminarse contenido en la Sección 11 del Artículo II de nuestra Constitución, sólo estamos exigiendo la expresa pertinencia de la información de un tercero que no ha sido identificado como el objeto de una investigación administrativa.